IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT DIABETES CARE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-514 (GMS) |
| | ) | |
| DEXCOM, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ABBOTT'S ANSWERING BRIEF IN OPPOSITION TO
DEXCOM'S MOTION (1) TO STRIKE THE COMPLAINT
PURSUANT TO RULE 12(f), OR IN THE ALTERNATIVE, (2) TO
CONSOLIDATE WITH C.A. NO. 05-590 (GMS) PURSUANT TO RULE 42(a),
OR (3) FOR STAY PENDING REEXAMINATION OF THE PATENTS IN SUIT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
Rodger D. Smith II (#3778)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200

*Attorneys for Plaintiff*
*Abbott Diabetes Care, Inc.*

OF COUNSEL:

James F. Hurst
Bradley C. Graveline
Stephanie S. McCallum
Eric L. Broxterman
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
312.558.5600

Dated: October 18, 2006

# TABLE OF CONTENTS

I.     STAGE OF PROCEEDINGS AND SUMMARY OF ARGUMENT .......................1

II.    STATEMENT OF FACTS.......................................................................................3

III.   ARGUMENT .......................................................................................................7

     A.   DEXCOM'S MOTION TO STRIKE HAS NO MERIT ..................................7

         1.   Abbott's Claims Are Not Redundant..........................................................7

         2.   The Court's Extension Of The Schedule In The 2005 Action Does Not Mean That The Patents Are At Issue In That Case ............................8

         3.   DexCom's Argument That Abbott Should Have Filed A Motion For Leave To Amend Is Wrong..................................................................9

     B.   DexCom's Motion For Stay Has No Merit....................................................10

         1.   A Stay Would Harm Abbott While Providing An Unfair Tactical Advantage to DexCom ...........................................................................11

         2.   DexCom's Motion to Stay Would Not Simplify The Issues; It Is Based on Reexam Requests That Rely Largely On Inapposite Or Previously Considered Prior Art.................................................................13

         3.   The Stage Of The Litigation Does Not Support DexCom's Request For A Stay..................................................................................16

     C.   DexCom's Motion to Consolidate is Premature and Would Prejudice Abbott ...........................................................................................................17

IV.   CONCLUSION ..................................................................................................18

## TABLE OF AUTHORITIES

*Cognex Corp. v. National Instruments Corp.*, No. Civ.A. 00-442-JJF,
2001 WL. 34368283 (D. Del. June 29, 2001)....................................................................11

*Dentsply International,  Inc. v. Kerr Manufacturing Co.*, 734 F. Supp. 656
(D. Del. 1990) .........................................................................................................................11

*Freeman v. Minnesota Mining and Manufacturing Co.*, 661 F. Supp. 886
(D. Del. 1987) .........................................................................................................................11

*Kearns v. GMC*, 94 F.3d 1553 (Fed. Cir. 1996) .................................................................7

*NTP, Inc. v. Research In Motion, Ltd.*, 397 F. Supp. 2d  785
(E.D. Va. 2005).......................................................................................................................10

*Owens v. Blue Tee Corp.*, 177 F.R.D. 673 (M.D. Ala. 1998).............................................8

*Remington Arms Co., Inc. v. Modern Muzzleloading, Inc*, No.
2:97CV00660, 1998 WL. 1037920 (M.D.N.C. December 17, 1998).........................11, 17

*Sovereign Software LLC v. Amazon.Com, Inc.*, 356 F. Supp. 2d 660
(E.D. Tex. 2005) ..........................................................................................................10, 13, 16

*St. Clair Intellectual Property Consultants Inc. v. Sony Corp.*, No. 01-
557-JJF (D. Del. Jan. 30, 2003) ....................................................................................2, 10

*Viskase Corp. v. America National Can Co.*, 261 F.3d 1316 (Fed. Cir.
2001) .........................................................................................................................................10

*Xerox Corp. v. 3 Committee Corp.*, 69 F. Supp. 2d 404 (W.D.N.Y. 1999)......................10

## STATUTES

35 U.S.C. § 285.........................................................................................................................6

Fed. R. Civ. P. 12(f)................................................................................................................8

## I.      STAGE OF PROCEEDINGS AND SUMMARY OF ARGUMENT

In an effort to prevent Abbott's day in court, DexCom has filed a motion to strike, consolidate and/or stay.  DexCom's goal is to delay, rather than efficiently litigate this dispute between the parties.  Delay will not serve judicial efficiency, but will prejudice Abbott.

DexCom's request to strike Abbott's Complaint is without merit. DexCom argues that Abbott's claims are redundant of claims that already exist in a previously filed suit (hereinafter the "2005 Action") wherein Abbott asserted four patents.  DexCom's assertion is not accurate.  In the instant case (hereinafter the "2006 Action"), Abbott has asserted three *different* patents.  Although Abbott previously tried to add these three different patents to the 2005 Action by way of amendment, the Court, on DexCom's motion, disallowed their inclusion on procedural grounds.  To avoid further procedural wrangling, Abbott filed the 2006 Action.  DexCom points to no authority which forbids Abbott from doing this.  Its lack of authority is telling and should end the inquiry of this issue.  DexCom opposed Abbott's assertion of these patents in the 2005 Action and now opposes Abbott's assertion of these patents in the 2006 Action.  Clearly, Abbott is entitled to assert these patents.  DexCom is opposing Abbott's assertion of these patents in order simply to delay these proceedings, which serves no legitimate end.

In the alternative, DexCom moves to stay this action pending reexamination requests that it filed for the three patents-in-suit in the 2006 Action.  These requests, which have not even been accepted by the USPTO, are based on substantively meritless prior art that is either inapposite or was previously considered by the examiners. Indeed, of the 86 claims in the three patents, DexCom was able to muster arguments for only 12 claims.  (DexCom Op. Br. at Exs. A-C).  The Court should therefore deny

DexCom's motion to stay because it "would unduly prejudice or present a clear tactical disadvantage to the non-moving party." *See, e.g., St. Clair Intellectual Property Consultants Inc. v. Sony Corp.*, No. 01-557-JJF, slip op. at 2 (D. Del. Jan. 30, 2003).

Last, DexCom moves to consolidate these actions. Abbott would be severely prejudiced by consolidation because the two cases are on very different schedules. Abbott filed the 2005 Action over one year prior to the 2006 Action. Significant discovery has occurred. More important, DexCom's requests for reexamination of the patents-in-suit in the 2005 Action have been accepted by the USPTO and have been pending for seven months. Conversely, the USPTO has not even decided whether to accept DexCom's requests for reexamination of the patents-in-suit in the 2006 Action. Even if the USPTO accepts DexCom's requests for reexamination, these patents may remain under review by the Patent Office well after the resolution of the reexaminations of the patents-in-suit in the 2005 Action – thereby acting only to further delay the 2005 Action. Further, DexCom's assertion that the two cases involve "closely related subject matter" (DexCom Op. Br. at 9) ignores that the 2006 Action includes the significantly different technology of the '855 Patent. The '855 Patent involves a modular microprocessor-based health monitoring system. This technology is significantly different from the technology of any of the patents in suit in the 2005 Action, and it involves a different inventor.

In sum, DexCom rushed to market with a device knowing full well that Abbott owned a number of patents that would be infringed by DexCom's product. At every step of the way, DexCom's litigation strategy has been focused on procedural maneuvering with the goal of delay. Simply put, DexCom hopes to realize as much

profit as it can in the near term and deal with the consequences of its infringement as far in the future as possible. Abbott asks the Court not to reward this strategy. If DexCom infringes even a single claim of the asserted patents, Abbott is entitled to relief. Yet, if DexCom has its way, Abbott will not be able to proceed at all toward developing its case and having its day in court until DexCom's very last reexamination request has been decided. Accordingly, Abbott requests that the Court deny DexCom's motion.

## II.    STATEMENT OF FACTS

Abbott filed the 2005 Action against DexCom in this Court in August of 2005. (C.A. No. 05-590 (D. Del.) at D.I. 1). DexCom's product infringed the four patents that Abbott asserted in that action. (*Id.* (asserting U.S. Pat. No. 6,565,509; U.S. Pat. No. 6,175,752; U.S. Pat. No. 6,284,478; U.S. Pat. No. 6,329,161, hereinafter referred to as "the Four Patents")). Specifically, Abbott alleged that DexCom had infringed the Four Patents and would continue to infringe the Four Patents when it received FDA approval of its STS continuous glucose monitoring system, then expected in the second quarter of 2006. (*Id.* at ¶¶ 22, 24).

Avoiding the merits, DexCom has engaged in a series of procedural delay tactics, including denying that the launch of its product was imminent and avoiding its discovery obligations. DexCom's pattern of delay was first highlighted to this Court at a scheduling conference in February 2006, prior to which DexCom refused to discuss a discovery schedule with Abbott, claiming that discussion of a schedule was unnecessary until the Court ruled on jurisdiction. (Tr. of Feb. 23, 2006 Hearing at pp. 2:19-3:18; attached as Ex. A). Abbott was requesting this discovery, among other reasons, to do further review of DexCom's infringing product, as well as to respond to DexCom's contentions that the Court lacked jurisdiction to hear the case because FDA approval of

- 3 -

DexCom's product was highly speculative. The Court agreed that discovery should proceed, specifically including a Rule 30(b)(6) deposition on the status of the FDA review process. (*Id.* at p. 29:10-14).

Despite the Court's directive at the scheduling conference, DexCom continued to delay in fulfilling its discovery obligations. With respect to document production, DexCom failed to make a meaningful document production until June 2006. In addition, instead of complying with the Court's order to produce a Rule 30(b)(6) witness, DexCom produced an unprepared witness who could not answer even basic questions related to the status of FDA approval.

Shortly after this deposition, DexCom received FDA approval for its product, obviating the need for Abbott to seek Court intervention related to the unprepared witness. However, despite that approval, DexCom did not produce a product sample and other documents that would have enabled Abbott to conduct further analysis of DexCom's product until June 2006. Abbott then amended its Complaint on June 27, 2006 – before the July 14, 2006 deadline for amending the pleadings. (C.A. No. 05-590 (D. Del.) at D.I. 55).

Throughout this whole process, DexCom continued to deny that its launch was imminent, even though (as it turns out) it had passed virtually every milestone necessary to obtain FDA approval. For example, at the scheduling hearing on February 23, 2006, DexCom represented that its "FDA situation is *essentially identical* to what it was when this case was filed on August 11, [2005]" that "*no material step* has occurred within the FDA at this point," that DexCom was "*right in the middle* of the FDA process," and that there "remains a *material likelihood* that [DexCom] will be asked

to modify [its] product." (Ex. A at p. 10:6-8 (emphasis added)). Critically, DexCom also

assured the Court that there would be a 30-day notice period before a product launch:

> Again, the approvable letter will lead to *at least the 30-day period* that counsel is asking for. That will be disclosed.
>
> THE COURT: So there's at least 30 days between the issuance of the approvable letter and the ---
>
> MR. DOYLE: Exactly, Your Honor. *That is the best case*, if everything goes well and we get a lot of attention from the FDA. And the FDA is a busy place, so we can't really count on that.

(*Id.* at pp. 27:15-28:8; emphasis added).

At the hearing, DexCom also stated that there was a "significant

likelihood" that the FDA would require an extra step of regulatory review called "panel

review" that could substantially delay DexCom's approval:

> *If it goes to panel review, then we would be lucky to have a product anytime in 2006.* Thus, again, the reason – and I apologize, Your Honor, I did not mean any offense to the Court – it just seemed impossible to me, given still, the *significant likelihood that we will go to a panel review*, that I could honestly state to your Court when we would be prepared to make disclosures and to agree to a schedule.

(Ex. A. at p. 26:18-20 (emphasis added)). During an earnings conference call that

occurred four days later, however, DexCom's CEO stated that "[we] have *not* been

notified about a need for us to go to panel for this device." (DexCom Earnings Call at p.

8 (emphasis added); attached hereto as Ex. B). As DexCom knew, it was about to receive

approval, and it did on March 27, 2006. Despite this knowledge, DexCom continued to

deny the launch was imminent up to its reply brief on its motion to stay, which was filed

on March 21, 2006. The very next day, DexCom sent Abbott a letter saying the launch

would occur within a week.

Despite the fact that DexCom has launched and is currently selling an infringing product – confirming all of Abbott's allegations in its initial Complaint – DexCom has resisted procedurally Abbott's efforts to have its day in Court and to assert all of the patents DexCom's product infringes.   Abbott's first attempt to assert three different and additional patents was on June 27, 2006, when Abbott filed an Amended Complaint in the 2005 Action.  (C.A. No. 05-590 (D. Del.) at D.I. 55 (asserting U.S. Pat. No. 5,899,855; U.S. Pat. No. 6,134,461; U.S. Pat. No. 6,990,366, hereinafter referred to as "Three Different Patents")).   DexCom opposed the addition of those patents to the 2005 Action by filing a motion to strike.  (*Id.* at D.I. 62).  On August 16, 2006, the Court granted DexCom's motion to strike and at the same time stayed the 2005 Action.  (*Id.* at D.I. 72).

As a result, the clear course of action for Abbott was to file the 2006 Action.[1] It was important for Abbott to timely assert these patents for various reasons, including but not limited to, preserving its right to damages under 35 U.S.C. § 285. Filing a new action avoided the prospect of further procedural wrangling in what was then a stayed case. [2]

On the very same day the Court struck Abbott's Amended Complaint and Abbott filed the 2006 Action, DexCom asked the USPTO to reexamine the Three Different Patents.[3]  (DexCom Op. Br. at Exs. A-C) (D.I. 6).   DexCom waited until

---

[1]    If Abbott had moved for leave to amend the 2005 Action, DexCom would certainly have argued that Abbott could not seek leave to amend a stayed case.

[2]    Abbott can hardly be accused of nefarious activity by filing the 2006 Action involving the Three Different Patents in the same jurisdiction when it could have filed this separate action in another jurisdiction.

[3]    DexCom filed two of its requests on August 16, 2006, and the third request on August 17, 2006.

August 16 to file these requests, despite being aware that Abbott intended to assert at least one of these patents in February of 2006.  Presumably, DexCom waited to file these requests with the goal of forcing Abbott to wait as long as possible to get its day in court.

## III.    ARGUMENT

### A.    DEXCOM'S MOTION TO STRIKE HAS NO MERIT

DexCom does not point to even one case to suggest that Abbott was not permitted to file the 2006 Action with the Three Different Patents.  This is because it was entirely proper for Abbott to do so.  Indeed, by trying to prevent Abbott from asserting these patents, DexCom ignores the fundamental principle of patent law that "each patent asserted raises an independent and distinct cause of action."  *Kearns v. GMC*, 94 F.3d 1553, 1555 (Fed. Cir. 1996).

### 1.    Abbott's Claims Are Not Redundant

DexCom asks this Court to strike Abbott's Complaint, arguing that the Three Different Patents Abbott is asserting in the 2006 Action are "redundant" and "duplicative of the same allegations of infringement" in the 2005 Action.  (DexCom Op. Br. at 5).  Even a cursory review of the record in the 2005 Action reveals the fallacy of DexCom's argument.

In its August 2006 Order in the 2005 Action, the Court *did not* permit Abbott to amend its complaint to add the Three Different Patents.  (C.A. No. 05-590 (D. Del.) at D.I. 72).  Accordingly, the issues associated with those patents are not presently at issue in that case.  Indeed, the Court, by implication, expressly denied Abbott's request for leave to add the Three Different Patents to the 2005 Action, which Abbott explicitly made in its Answering Brief. (*Id.* at D.I. 66 at 9 ("[i]f the Court finds leave is required, Abbott affirmatively requests it.")).

DexCom's own authority illustrates that Abbott's assertion of the Three Different Patents does not fall within the definition of redundant under Fed. R. Civ. P. 12(f).  For example, DexCom cites *Owens v. Blue Tee Corp*., 177 F.R.D. 673, 678 (M.D. Ala. 1998), to try to explain what is meant by the term "redundant."  (DexCom Op. Br. at 5).  In *Owens*, however, the court explained that "redundant" means asserting a claim that is the same as a "claim in a **pending**, previously filed action."  (*Id*.) (emphasis added). The key here, is that there are no other allegations currently pending against DexCom regarding the Three Different Patents that Abbott has asserted in the 2006 Action.  The only pending allegations in the 2005 Action involve the Four Patents, not the Three Different Patents that are the basis for Abbott's Complaint in the 2006 Action.

Further, only one of the Three Different Patents is even related to any of the Four Patents in the 2005 Action.  The claims of the '855 and the '461 patents are not supported by the specifications in any of the Four Patents in the 2005 Action.  Moreover, the technology in the '855 patent, which relates to a modular microprocessor-based health monitoring system, is very distinct from the Four Patents asserted in the 2005 Action.

### 2.    The Court's Extension Of The Schedule In The 2005 Action Does Not Mean That The Patents Are At Issue In That Case

DexCom argues that the Three Different Patents Abbott asserts in the 2006 Action are at issue in the 2005 Action because the Court adjusted the schedule in the 2005 Action to accommodate for their inclusion.  This argument is facially flawed. DexCom is ignoring that the 2005 Action is stayed, which means that there is *no* schedule in that case.

Moreover, the schedule in the 2005 Action was set *before* the Court ruled on whether the Three Different Patents could be added to that case.  Indeed, the schedule was set on July 21, 2006 and the Court subsequently rejected Abbott's attempt to add the Three Different Patents on August 16, 2006.  Accordingly, any schedule regarding the Three Different Patents in the 2005 Action was mooted by the Court's order not allowing the patents to be added to that litigation.  DexCom's argument that the schedule in the 2005 Action somehow includes the patents asserted in the 2006 Action – when these patents were stricken from the 2005 Action – is nonsensical.

It simply cannot be disputed that the Three Different Patents Abbott asserts in the 2006 Action are not currently at issue in the 2005 Action.  The Court struck the Amended Complaint, in which Abbott attempted to assert the Three Different Patents in the 2005 Action.  The claims of the 2006 Action cannot be redundant because they involve different patents.  DexCom has no right to preclude Abbott from litigating its rights under the Three Different Patents.

### 3.    DexCom's Argument That Abbott Should Have Filed A Motion For Leave To Amend Is Wrong

DexCom argues that Abbott could have added the Three Different Patents to the 2005 Action by seeking leave to supplement the Complaint.  DexCom ignores that Abbott requested leave in its Answering Brief, and the Court, by striking the Amended Complaint without granting leave to amend or supplement, denied Abbott's request.

Moreover, the Court's deadline in the 2005 Action for amending pleadings was July 14, 2006, a deadline which had passed at the time of the Court's ruling.[4]  Filing

---

[4]    It should be noted that Abbott's Amended Complaint, filed on June 27, 2006, met this deadline.

a separate action avoided all arguments as to whether Abbott could or could not pursue a motion to amend in a case that was stayed and in which the deadline for amended pleadings had passed.

### B.    DEXCOM'S MOTION FOR STAY HAS NO MERIT

In the alternative, DexCom moves to stay this action.  It is well-settled law that "[a] court is under no obligation to delay its own proceedings by yielding to ongoing USPTO patent reexaminations, regardless of their relevancy to infringement claims which the court must analyze." *NTP, Inc. v. Research In Motion, Ltd.*, 397 F. Supp. 2d 785, 787 (E.D. Va. 2005).  Rather, "[t]he court is not required to stay judicial resolution in view of the [USPTO] reexaminations".  *Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1328 (Fed. Cir. 2001).  Freely granting a stay every time an infringer filed a reexamination request would not promote the efficient and timely resolution of patent cases, but "would invite parties to unilaterally derail timely patent case resolution by seeking reexamination." *Sovereign Software LLC v. Amazon.Com, Inc.*, 356 F. Supp. 2d 660, 662-63 (E.D. Tex. 2005).  Most notably, the USPTO has **<u>not</u>** granted DexCom's request to reexamine the Three Different Patents.

In determining whether a stay is appropriate, a court should be guided by the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *See, e.g., St. Clair Intellectual Property Consultants Inc. v. Sony Corp.*, No. 01-557-JJF, slip op. at 2 (D. Del. Jan. 30, 2003) (attached as Ex. C); *Xerox Corp. v. 3 Comm. Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999) (denying a motion to

stay despite the fact that the patents-in-suit were accepted for reexamination). These factors weigh against a stay.

#### 1.    A Stay Would Harm Abbott While Providing An Unfair Tactical Advantage to DexCom

Delaware courts have noted that "in balancing the[] factors, courts must be particularly mindful of the consequences of the stay on other parties." *Cognex Corp. v. National Instruments Corp*., No. Civ.A. 00-442-JJF, 2001 WL 34368283, at *1 (D. Del. June 29, 2001). In doing so, the Court must evaluate whether "there is even a fair possibility that the stay would work damage on another party." *Dentsply International, Inc. v. Kerr Manufacturing Co*., 734 F. Supp. 656, 658 (D. Del. 1990) (internal citations omitted). "Generally, courts are reluctant to stay proceedings where a party is using the reexamination process merely as a dilatory tactic." *Remington Arms Co., Inc. v. Modern Muzzleloading, Inc*, No. 2:97CV00660, 1998 WL 1037920, *3 (M.D.N.C. December 17, 1998) (citing *Freeman v. Minnesota Mining and Mfg. Co.*, 661 F. Supp. 886, 887 (D. Del. 1987)).

Here, DexCom is doing just that. DexCom has known about Abbott's intent to assert additional patents since February, including specifically the '366 patent. Abbott made its desire to assert these patents clear in a scheduling conference in the 2005 Action. Abbott had not asserted these patents at that time because Abbott wanted some confirmatory discovery, which DexCom fought, but was ultimately ordered to give to Abbott. Once Abbott received the discovery that DexCom had resisted, Abbott amended its Complaint and added the Three Different Patents. DexCom then moved to strike Abbott's Amended Complaint rather than allow those patents to be part of the case. DexCom, however, waited until the Court ruled whether these Three Different Patents

would be part of the 2005 Action before requesting reexamination from the USPTO. DexCom filed two of its reexamination requests (for the '461 and '366 patents) the very same day the Court issued its ruling on DexCom's motion to strike and Abbott filed the 2006 Action; DexCom filed its third reexamination request (for the '855 patent) the very next day. Clearly, these requests, which comprise hundreds of pages of materials, were not put together in a day. Instead, DexCom waited until the latest possible moment to file, assuring that Abbott would have to wait as long as possible to get its day in court if this action were stayed.

DexCom's conduct in the 2005 Action also makes it clear that it is using the reexamination process as a device to delay judicial resolution of the case's merits. Prior to the scheduling conference in February 2006, DexCom refused even to discuss a discovery schedule with Abbott, claiming that discussion of a schedule was unnecessary until the Court ruled on jurisdiction. (Ex. A at 2:19-3:18). The Court rejected DexCom's argument and agreed that discovery should proceed, specifically including a Rule 30(b)(6) deposition on the status of the FDA review process. (*Id.* at 29:10-14). Despite the Court's directive at the scheduling conference, DexCom <u>continued to delay</u> in fulfilling its discovery obligations, produced an unprepared witness, and avoided any discovery with respect to its impending launch. DexCom also refused to produce a product sample and other documents that would have enabled Abbott to conduct further analysis of DexCom's product until June 2006 – several months after launch of the product.

DexCom's latest tactics are more of the same. DexCom has filed meritless reexamination requests and now moved to stay this litigation with the hope of

- 12 -

pushing the consequences of its infringement as far into the future as possible. Allowing DexCom to benefit from these tactics "would not promote the efficient and timely resolution of patent cases, but would invite parties to unilaterally derail timely patent case resolution by seeking reexamination." *Sovereign Software*, 356 F. Supp. 2d at 662-63. DexCom's conduct in this case argues strongly in favor of denying DexCom's request for a stay.

>    **2.     DexCom's Motion to Stay Would Not Simplify The Issues; It Is Based on Reexam Requests That Rely Largely On Inapposite Or Previously Considered Prior Art**

DexCom filed its multiple reexamination requests to stall this case; they do not raise any real doubts about the patentability of Abbott's inventions. DexCom is abusing the low threshold required by the USPTO to initiate reexamination requests by asserting frivolous arguments that, in the end, will result in little or no change to the patents.[5]

---

[5]  This low threshold was criticized by Jon Dudas, the Director of the USPTO, when he spoke before Congress in 2005 regarding the "fairness" of the current reexamination procedures. Specifically, Mr. Dudas discussed certain proposals that would help prevent "exposing a patent holder to frivolous or even mischievous review and uncertainty." One of his proposals was directed at the current standard under which reexaminations are granted. In addressing this new standard, Mr. Dudas stated:

> The USPTO would require the challenger to present sufficient grounds before instituting post-grant-review. This is more than a substantial new question of patentability, the reexamination standard, in most cases requiring the challenger to present evidence that if unchallenged would establish unpatentability. We anticipate under this standard the Board would dismiss many petitions without any input from the patent owner. This is one safeguard against abusive or disingenuous filings designed to harass patent owners.

(Statement of Jon Dudas Before the Congress, attached as Ex. D).

To raise the "substantial question" required for reexamination, the Patent Office makes clear that "it is only necessary … that a reasonable examiner would consider the teaching [of the prior art cited in the infringer's petition] to be important in deciding whether or not the claim is patentable," which means it does not matter whether the prior art is less relevant than the art the USPTO already considered and, in fact, it is "not necessary" for the infringer to even "establish a prima facie case of unpatentability." MPEP § 2242 (8th ed., Rev. 1, Feb. 2003). Moreover, the question the infringer presents is considered "new" – even if the new art is less relevant than the prior art already considered and, indeed, even if the infringer cites no new art – as long as the very "same question of patentability . . . has not been decided in a previous examination of the patent." *Id.* DexCom is attempting to take advantage of this standard in order to prevent Abbott from rightly asserting its patents.

Abbott's patents were thoroughly examined before issuance. The Patent Office issued numerous office actions testing and probing the most relevant prior art. Accordingly, DexCom can only manage to muster arguments for 12 out of a possible 86 claims that are listed in the three patents. (DexCom Op. Br. at Exs. A-C) (D.I. 6). In these arguments, DexCom misconstrues the claims, provides contradicting definitions, and relies on prior art that has already been before the examiner.

Indeed, DexCom's petition urges the examiner to construe the claims "as broadly as their terms reasonably allow." In fact, DexCom relies on overly-broad claim constructions that no court should adopt. Specifically, in its reexamination request for the '366 patent, DexCom's entire anticipation argument hinges on *one* piece of prior art that DexCom argues will invalidate the patent "*if* 'sensor control unit' is construed

broadly." (*Id.* at Ex. B, DexCom's Req. for Reexamination of U.S. Pat. No. '366) (emphasis added).

   Moreover, DexCom relies on two different claim constructions for the term "sensor control unit" – a central component of the '366 patent.  DexCom first states that: "[r]equester respectfully submits that the broadest reasonable interpretation of a 'sensor control unit' would at least encompass a device that is electrically coupled to a sensor *to receive* signals from the sensor in order to evaluate those signals and/or *transmit* those signals (via hardwire or wirelessly) to an external device for evaluation." (*Id.* at 22) (emphasis added.)   Later, DexCom states:   "[r]equester submits that the broadest reasonable interpretation of a 'sensor control unit' may encompass a device that *merely* controls insertion, positioning and/or electrical connectivity of the sensor." (*Id*. at 34) (emphasis added).  These contradicting claim constructions evidence DexCom's blatant use of untenable arguments in its reexamination requests to try to delay this litigation.

   With respect to the '855 reexamination request, DexCom badly misinterprets a key component of that invention as well.  The "monitoring means" used in the '855 Patent produces digitally encoded health signals representative of the monitored condition.  (*See*, *e.g*., *id.* at Ex. C, claim 47).  None of the "monitoring means" in DexCom's cited prior art produce digitally encoded health signals.  Instead, the output from "monitoring means" in DexCom's cited prior art is analog.  (*Id.* at 22-24, DexCom's Req. for Reexamination of U.S. Pat. No. '855).  DexCom's misinterpretation of basic elements such as digital and analog make its reasons for filing its reexamination requests transparent.

Regarding the '461 patent, DexCom's main piece of prior art, Shichiri I, which it relies upon in almost every anticipation argument, was already before the examiner. (*Id.* at Ex. A). In fact, roughly half of the prior art that DexCom relies upon was previously considered during the original examination of the '461 patent. (*Id.*).

The bottom line is that DexCom is attempting to misuse the reexamination process by forcing the USPTO to examine these baseless arguments in the hope that this Court will stay the current litigation.

### 3. The Stage Of The Litigation Does Not Support DexCom's Request For A Stay

In considering a party's request for a stay, courts also consider the stage of the proceedings. DexCom has clearly timed its reexamination requests to attempt to manipulate the litigation schedule to its advantage, a strategy that this Court should not reward. *See, e.g.*, *Sovereign Software LLC*, 356 F. Supp. at 662-63 (parties should not be allowed to unilaterally derail patent cases by seeking reexamination). As noted above, DexCom filed two of its reexamination requests the exact same day Abbott filed the 2006 Action, and it filed its third request the very next day. Given the volume of these filings, it simply would be implausible to conclude that DexCom did not hold them back until the last possible moment. Indeed, DexCom told the Court at a hearing in February 2006 that it intended to seek reexamination of at least one of the patents Abbott asserted in the 2006 Action. (Ex. A at 31). Having engaged in such gamesmanship, DexCom's assertion that the stage of the litigation favors a stay falls flat. If anything, the stage of the litigation favors allowing the case to proceed. Abbott fully expects that the USPTO will reject DexCom's reexamination requests long before this case is ready for trial. There is no

reason to require Abbott to delay seeking infringement when the USPTO has not even accepted DexCom's requests.

Moreover, after Abbott launches its competing product – which is the embodiment of its patents – Abbott may decide to seek injunctive relief at that time. The case should not be stayed until Abbott has been afforded the opportunity to exercise its rights to seek this relief. *See Remington Arms Co. v. Modern Muzzleloading Inc.*, No. 2:97CV00660, 1998 WL 1037920, at *2 (M.D.N.C. Dec. 17, 1998).

## C. DEXCOM'S MOTION TO CONSOLIDATE IS PREMATURE AND WOULD PREJUDICE ABBOTT

Any considerations of consolidation at this time are premature because of the pending requests for reexamination that DexCom filed with the USPTO. The reexamination requests that serve as the basis for DexCom's motion have not been granted and might not be granted. Given their lack of substance, there is a good chance that they will not be granted. If they are denied, there is no reason to delay this case.

Further, the USPTO has not yet reached substantive decisions on the patents-in-suit in the 2005 Action. Those patents are already well into the reexamination process, and the reexamination process for these patents will likely be finished much sooner than the reexaminations that DexCom recently requested if the USPTO grants DexCom's requests. Because DexCom delayed in submitting its reexamination requests for the Three Different Patents in the 2006 Action, presumably to gain a tactical advantage, Abbott should be able to proceed with litigation of the Four Patents in the 2005 Action if those claims are affirmed. If the Four Patents come out of reexamination, there is no reason to delay the 2005 Action.

Moreover, much of the technology at issue in the 2006 Action is very different from the technology at issue in the 2005 Action. As DexCom acknowledges, two of the patents-in-suit in the 2006 Action are not in the same patent families as the Four Patents in the 2005 Action. The '855 patent (asserted in the 2006 Action) relates to a modular microprocessor-based health monitoring system, which is quite different from the technology at issue in the Four Patents in the 2005 Action.

The Four Patents at issue in the 2005 Action and this case are on very different schedules involve different technology, and it would be premature to order consolidation at this time. Accordingly, DexCom's motion to consolidate should be denied.

## IV.    CONCLUSION

For the foregoing reasons, Abbott respectfully requests that this Court Deny DexCom's Motion To Strike, Motion to Stay and Motion to Consolidate.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Mary B. Graham*

_____

Mary B. Graham (#2256)
Rodger D. Smith II (#3778)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200

*Attorneys for Plaintiff*
*Abbott Diabetes Care, Inc.*

OF COUNSEL:

James F. Hurst
Bradley C. Graveline
Stephanie S. McCallum
Eric L. Broxterman
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL  60601
312.558.5600

Dated:  October 18, 2006
542131

- 18 -

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2006, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

> Josy W. Ingersoll
> YOUNG CONAWAY STARGATT & TAYLOR LLP
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE  19899-0391

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on October 18, 2006 upon the following individuals in the manner indicated:

**BY E-MAIL AND HAND DELIVERY**

Josy W. Ingersoll
YOUNG CONAWAY STARGATT & TAYLOR LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

**BY E-MAIL**

David C. Doyle
MORRISON & FOERSTER LLP
3811 Valley Centre Drive
Suite 500
San Diego, CA  92130-2332

*/s/ Mary B. Graham*

_____

Mary B. Graham (#2256)

542143

# EXHIBIT A

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                         -  -  -

 4    ABBOTT DIABETES CARE, INC., :      Civil Action

 5              Plaintiff,          :

 6         v.                       :

 7    DEXCOM, INC.,                 :

 8              Defendant.          :      No. 05-590-GMS

 9                         -  -  -

10                   Wilmington, Delaware
                Thursday, February 23, 2006
11                      11:00 a.m.

12                         -  -  -

13    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

14    APPEARANCES:

15         MARY B. GRAHAM, ESQ.
           Morris, Nichols, Arsht & Tunnell
16              -and-
           JAMES F. HURST, ESQ.
17         Winston & Strawn
           (Chicago, Illinois)
18
                             Counsel for Plaintiff
19
           JOHN W. SHAW, ESQ., and
20         CHAD STOVER, ESQ.
           Young Conaway Stargatt & Taylor LLP
21              -and-
           DAVID C. DOYLE, ESQ.
22         Morrison & Foerster LLP
           (San Diego, California)
23
                             Counsel for Defendant
24

25
```

2

1    THE COURT: Please be seated. Let's start out

2    with introductions, if we could. Counsel for plaintiff.

3         MS. GRAHAM: Good morning, Your Honor. Mary

4    Graham, on behalf of Abbott. And with me this morning is

5    James Hurst from Winston & Strawn in Chicago. He will be

6    addressing the Court today.

7         THE COURT: Good morning.

8         MR. HURST: Good morning, Your Honor.

9         THE COURT: Mr. Shaw.

10         MR. SHAW: Good morning, Your Honor. John Shaw

11    at Young Conaway for DexCom. With me is David Doyle from

12    Morrison & Foerster in San Diego, and Chad Stover from my

13    office.

14         (Counsel respond "Good morning.")

15         THE COURT: Good morning. You may be seated.

16         The Court wants to first make an inquiry as to

17    whether certain things it has read in the so-called joint

18    status report are accurate. I am at Page 9, under the

19    heading Discovery. I see the sentence, second sentence,

20    attributed to Abbott, that DexCom declined to discuss or

21    propose a schedule until the Court ruled on its motion to

22    dismiss.

23         I would like to know if that is correct.

24         MR. HURST: That is correct, Your Honor.

25         THE COURT: Is that correct, counsel?

3

1         MR. DOYLE: It is correct in the following

2    sense.

3         THE COURT: I want to know if it is correct or

4    not.

5         MR. DOYLE: We were agreeable to setting the

6    general time frame. Then we thought, if Your Honor wanted

7    to go forward, that Your Honor probably would want to fill

8    in the other dates.

9         THE COURT: Is it correct or not, counsel?

10         MR. DOYLE: It is, Your Honor.

11         THE COURT: I see, then, this statement

12    attributable to DexCom, at the same page, under the heading

13    DexCom's Statement:

14              DexCom believes that the parties should not

15    discuss specific dates or schedules until this Court rules

16    on the pending motion to dismiss Abbott's complaint.

17         Is that an accurate statement?

18         MR. DOYLE: It is, Your Honor.

19         THE COURT: It is extraordinary. Please be

20    seated.

21         This is a formal session of Court, and it has

22    been convened in large part to remind you, particularly

23    counsel for DexCom, where you are. This is a United States

24    District Court. I am a United States Judge. I do not issue

25    requests. I issue orders.

4

1         Did you misapprehend, counsel, that the notice

2    of scheduling that you got in this case was a request?

3    Counsel, that requires an answer.

4         MR. DOYLE: I just want to be sure --

5         THE COURT: I will read it for you. You should

6    have all -- you may not have it with you. But I have a

7    form. I don't have the actual notice in hand that was

8    electronically filed. But it reads in part:

9         It is hereby ordered, in bold, all caps, that

10    pursuant to Rule 16, Federal Rules of Civil Procedure, and

11    Local Rule 16.2(b), a status and scheduling conference in

12    the above-referenced matter has been set at the United

13    States Courthouse, 844 King Street, Room 4325, Wilmington,

14    Delaware. Counsel with primary responsibility for this case

15    shall appear and be prepared to address any pending motions

16    in preparation for the conference. Counsel are directed to

17    confer with respect to all agenda items listed below.

18         And there are a number of them listed.

19         This order of the Court triggers, automatically,

20    certain rules, known as the Federal Rules of Civil

21    Procedure. Specifically, Rule 16 and Rule 26(f). Yet you

22    sit here before me, counsel, admitting, having done so in

23    writing previously, that you declined to follow an order of

24    this Court.

25         Can you explain yourself? Please approach the

5

1  podium and do so.

2          MR. DOYLE: Yes, Your Honor. Our problem is the

3  following.

4          We don't have the two key, we don't have the two

5  key elements --

6          THE COURT: Stand up straight, counsel. Don't

7  lean on that podium.

8          MR. DOYLE: We don't have the two key elements

9  necessary to set a schedule in a patent case here. First,

10  there is not an accused product.

11          THE COURT: In your view -- and I am not going

12  to give you an opportunity, as you attempted here in this

13  joint status report, to argue your position on the motion to

14  dismiss, positions of which I am now aware. Quite frankly,

15  counsel, I view this, in addition to being boldly

16  recalcitrant and disrespectful of this Court's process, not

17  of this Judge as a human being, but of this office, the

18  office that I hold, the black robe that I wear, that I wear,

19  counsel, not you, regardless of what you believe may be the

20  case, this Court has ordered you to appear --

21          Mr. Shaw, sit down.

22          I have had a chance to review the summary of the

23  arguments in the motions. Quite frankly, I don't think you

24  have a winning position. But I have not finally determined

25  whether you do or you do not.

6

1          You are not the first party who has come before

2  this Court having filed a motion to dismiss wanting to jump

3  ahead in the queue, to get your matter resolved ahead of

4  everyone else. Quite frankly, that is what I believe is a

5  part of the tactic that has been employed here.

6          I don't like it. I won't tolerate it. If this

7  matter were the only one that the Court had on its docket, I

8  would gladly -- you would know the Court's position. You

9  would have known it well in advance of your coming here

10  today. Maybe you would have prevailed and would not even be

11  here today. But you have not prevailed. And consequently,

12  you have certain obligations as an officer of this Court,

13  having been admitted pro hac, you have responsibilities that

14  you must attend, counsel.

15          So I don't want to hear from you regarding the

16  merits, what you believe to be the merits of your position

17  on your motion to dismiss. And I won't hear from you

18  regarding your position on scheduling, because you forfeited

19  that opportunity and that right to have input into what this

20  schedule will eventually be.

21          You may sit.

22          MR. DOYLE: Yes, Your Honor.

23          THE COURT: We are going to go to scheduling.

24  But for the fact that I don't want to penalize the

25  plaintiff, who comes here in good faith today, having

7

1  followed the orders of this Court, or attempted to, at

2  least, I would send you all away and tell you to come back

3  another day. But I think that would be an abuse of my

4  discretion, quite frankly, and, quite frankly, would be

5  unfair to the plaintiff.

6          I have thought about other remedies as well. I

7  have elected not to consider them as well, including finding

8  you in contempt.

9          If we could go to Tab 1 in the so-called joint

10  status report, we will discuss the schedule.

11          Plaintiff has proposed that initial disclosures

12  be completed -- I guess they have been completed. Is that

13  correct?

14          MR. HURST: We have supplied our initial

15  disclosures, Your Honor. DexCom has not.

16          THE COURT: When are you going to be able to do

17  that? Do you want to address that, Mr. Shaw?

18          MR. SHAW: I was going to say, Your Honor, we

19  had objected, as permitted under Rule 26(a)(1), as to doing

20  the initial disclosures -- as far as the date, Mr. Doyle

21  will address that. Your Honor, if I could --

22          THE COURT: You can step up, Mr. Shaw.

23          MR. SHAW: I need to apologize to Your Honor

24  because in part the draft scheduling, joint status report is

25  my doing. The one thing that I had wanted to make sure was

8

1  in front of Your Honor were all the issues that could bear

2  on scheduling. That is why I had counsel in favor of

3  identifying the open issues.

4          THE COURT: I don't have a problem with

5  identifying issues, Mr. Shaw. I have a problem with the

6  behavior that was attendant to your position, the position

7  that you and your colleagues took.

8          MR. SHAW: I understand that, Your Honor. I

9  apologize for that.

10          We do have one thing that is in there on

11  scheduling that is important. We did look at the case and

12  think about how long it would take to get to trial. We did

13  identify that in the portion about discovery and the length

14  of discovery.

15          In terms of the relative dates that were in

16  there, based on the trial date, once Your Honor has selected

17  that trial date, for the most part, are not disagreeable to

18  DexCom or even issues with DexCom.

19          The primary point that was important for our

20  side to address was the trial date relative to fixing what

21  the issues were in the case in terms of products. That is

22  at the end, I believe, of Paragraph 9, on Page 10.

23          THE COURT: What is it?

24          MR. SHAW: Just the relative time to trial, that

25  24 months was the time frame that it looked like this case

9

1  would need to be prepared, and then we had looked at dates
2  backwards from the trial date that Abbott had proposed. In
3  other words, in terms of the scheduling dates that Abbott
4  was proposing, if you look at those relative to the trial
5  date, roughly, those are all right, with one area we wanted
6  to comment on, which was the disclosure of opinions of
7  counsel.
8      But I wanted to, A, first of all, make sure I
9  had told Your Honor how this report came to be the way it
10  was, also to point out one of the important items that is in
11  here is the 24 months to trial. And the reason that is in
12  there is multi-fold, has been, the items Mr. Doyle has
13  identified.
14     You have identified the outstanding items of
15  subject matter jurisdiction.
16     THE COURT: We can jump ahead, and I will permit
17 you to have input, Mr. Shaw.
18     The trial date is going to be October 8th of
19 '07. So I think that will probably address concerns.
20     MR. SHAW: Thank you, Your Honor.
21     THE COURT: So, then, the question remains to
22 DexCom, when will you be in a position to provide your
23 initial disclosures?
24     MR. DOYLE: As soon -- we will prepare -- let me
25 step up, Your Honor.

10

1      We will prepare at whatever date Your Honor
2  directs us to. We can do that based on the information
3  currently available to us. Again, I am not trying to argue
4  the merits of the pending motion. It is just our product is
5  a prototype. We can answer on the basis of that prototype
6  as submitted to the FDA. We are still right in the middle
7  of the FDA process. There remains a material likelihood
8  that we will be asked to modify that product.
9      But we can answer and will do so at Your
10 Honor's, whenever Your Honor would like to in terms of our
11 current prototype.
12     THE COURT: Mr. Hurst.
13     MR. HURST: I guess I would prefer to see the
14 initial disclosures earlier rather than later. If I can
15 address the point about the prototype, Your Honor.
16     THE COURT: Sure.
17     MR. HURST: I don't know if you do want to hear
18 about the merits of the motion. I understand you don't.
19     THE COURT: I don't.
20     MR. HURST: I have --
21     THE COURT: I would love to if I had time to
22 prepare. By that I mean have written briefs. I haven't had
23 time to do that. I have other things to do.
24     MR. HURST: On the strict issue of the initial
25 disclosures, we would prefer to see them sooner rather than

11

1  later in order to keep with the schedule we had proposed.
2      THE COURT: For sooner, counsel, what can you
3  handle?
4      MR. DOYLE: Two weeks, Your Honor?
5      THE COURT: Acceptable?
6      MR. HURST: That is fine, Your Honor.
7      THE COURT: What date is that, Ms. Walker?
8      MS. WALKER: March 14th.
9      THE COURT: March 14th is two weeks by our
10 calculation. That would be the date for the provision of
11 initial disclosures by DexCom.
12     Now, the reliance upon the advice of counsel --
13 you see, as annoyed as I am, it occurred to me before I came
14 out and it occurs to me of course again, it is really not in
15 the best interests of anyone to have a schedule that is
16 unrealistic. This is why we have a 26(f).
17     So, per force, we are going to need to have
18 input from both sides. In the main, my inclination is to
19 decidedly accept the schedule insofar as we are able that
20 the plaintiff has proposed.
21     So here we have plaintiff proposing that the
22 reliance upon advice of counsel be completed by the July the
23 13th, at least disclosure of the decision. I gather you are
24 talking about the production of opinions?
25     MR. HURST: Yes, Your Honor.

12

1      MR. DOYLE: Your Honor, that was the only aspect
2  of the schedule that I found problematic, because as I know
3  Your Honor appreciates, it is such a key strategic decision
4  in the case, I would prefer that that be, if possible, after
5  the claim construction hearing. Other than that, the other
6  dates seem to make sense.
7      THE COURT: Mr. Hurst.
8      MR. HURST: The reason I think it needs to be
9  earlier, Your Honor, is because if they do decide to rely on
10 counsel's advice, we are going to need to take discovery on
11 that. We would rather have it earlier rather than later so
12 we are not re-plowing ground that we have already been over.
13 So July 13 seems to make sense to me.
14     THE COURT: Do you want to reply to that?
15     MR. DOYLE: Yes. Because the only discovery
16 that relates to the opinion would be lawyers.
17     THE COURT: And the deposition, yes.
18     MR. DOYLE: Yes.
19     THE COURT: I am inclined towards later on this,
20 because I think counsel is correct, that we are talking
21 about the opinion, or opinions, and the depositions of
22 counsel.
23     MR. HURST: That is acceptable, Your Honor.
24 Thank you.
25     THE COURT: So, counsel -- it's Mr. Doyle, is

13

1  it?

2          MR. DOYLE: Yes, Your Honor.

3          THE COURT: What do you want to propose in terms

4  of this date?

5          MR. DOYLE: Yes. Looking at this schedule, if

6  it is going to be consistent with the Court's availability,

7  to have a Markman hearing around September 11.

8          THE COURT: We are going to do Markman October

9  24.

10          MR. DOYLE: If we could have till maybe the day

11  or two before Thanksgiving, after that, whatever that day

12  is.

13          THE COURT: What day is that, Ms. Walker?

14          MR. SHAW: Your Honor, I was going to suggest

15  maybe two weeks after the opinion comes out, the Markman

16  opinion.

17          THE COURT: That is fine.

18          MR. DOYLE: That would work, yes, Your Honor.

19          THE COURT: Typically, though not in every

20  instance, but in most, I think the vast majority of cases I

21  have been able to get my Markman orders, not opinions,

22  orders out within 30 days of the hearing. The Federal

23  Circuit hasn't jumped on me yet. They are coming, though.

24  I hear them close on my heels.

25          So until I have been directed otherwise, I will

14

1  continue to do that. That makes sense.

2          Two weeks after the -- we are talking November

3  24 or somewhere around there, two weeks after that.

4          MS. WALKER: December 8th.

5          THE COURT: Ms. Graham, I am going to ask that

6  plaintiff prepare this schedule.

7          MS. GRAHAM: We are happy to do that, Your

8  Honor.

9          THE COURT: You got that last date then?

10          MS. GRAHAM: Yes.

11          THE COURT: So then the cutoff for joinder

12  proposed by plaintiff and amendment of pleadings is October

13  2. I have some difficulty with that, counsel, that cutoff

14  being that late in the process. You know, if you wanted to

15  confine it -- if you are concerned about inequitable conduct

16  or something like that, that is really what the rub is, and

17  you want to confine the amendment and joinder to that

18  specific area, I think that would be more acceptable and

19  perhaps -- because the Court is going to accept the October

20  20 fact cutoff. But I wouldn't want to explode the schedule

21  by adding patents and parties that late, certainly without

22  good cause, very, very good cause.

23          So if you want to consider bifurcating the

24  amendment and joinder cutoffs, you can do that. What do you

25  want to do?

15

1          MR. HURST: Your Honor, there is some likelihood

2  that we will add patents to this case. Although I don't

3  think I need as far out as October 2nd. An earlier date

4  would be acceptable to Abbott. I would even suggest as

5  early as July 15th.

6          THE COURT: Well, I am sure the defendant is not

7  going to have a problem with that, it being sooner rather

8  than later. You might have a problem with the point that

9  was made about adding patents.

10          MR. DOYLE: Yes, Your Honor. Again, that has

11  been a big part of our concern, because we know they have

12  got more patents coming.

13          THE COURT: I am sure that is part of the reason

14  that you moved in the manner that you have.

15          MR. DOYLE: Yes, Your Honor.

16          THE COURT: July 15 then it is.

17          MS. WALKER: July 14.

18          THE COURT: July 14, okay. Of course, counsel,

19  lest there be any question -- incredibly enough, this came

20  up in a case -- of course, you can move after the cutoff for

21  good cause to amend and join. I was just astounded when I

22  had it argued by very seasoned counsel not long ago that

23  they didn't understand that. They thought the cutoff was

24  the cutoff. How can that be?

25          Okay. July 14th.

16

1          All right. Then, plaintiff has proposed the

2  following, in terms of the preparation, the meet-and-confer,

3  the gearing up for the Markman process, that the initial

4  exchange of list of disputed terms occur by the 26th of

5  June, that the meet-and-confer take place by July 10, if not

6  on July 10. Is that the actual date you are proposing?

7          MR. HURST: Yes, Your Honor.

8          THE COURT: On July 10.

9          That final joint claim charts -- and you should

10  put in there, with a reference to the intrinsic record, that

11  should be a part of the scheduling order. There is language

12  around to that effect -- by July 17.

13          Those are the dates that plaintiff continues to

14  propose?

15          MR. HURST: Yes, Your Honor.

16          THE COURT: I am assuming those are dates by

17  which, having already indicated that in the main other than

18  what has already been stated you could agree with, the dates

19  that have been proposed by plaintiff?

20          MR. DOYLE: Yes, Your Honor.

21          THE COURT: So, then, opening claim construction

22  briefs, July 31. Answering briefs, August 28th.

23          Markman, October 24, 10:00 a.m. Now, we have

24  four patents and I have just been told that there is a

25  possibility -- this all assumes, obviously, that the action

17

1  survives the motion to dismiss. How many more patents are
2  we talking about?
3          MR. HURST: Your Honor, we are reviewing that
4  right now. I do not have an answer for you. I think right
5  now there is at least a likelihood that one more patent will
6  be added. But I don't have a specific number for you.
7          THE COURT: How do counsel characterize this
8  particular technology in terms of complexity? What are we
9  dealing with in terms of complexities?
10         MR. HURST: We are dealing with glucose
11 monitors. It's probably about, similar in complexity to
12 your average pharmaceutical case. It has to do with remote
13 glucose monitoring.
14         Right now patients, the standard of care is
15 that, someone who is a diabetic, they have to prick their
16 finger several times a day to measure their glucose levels.
17 The invention at issue was accomplished in the early
18 nineties, mid-nineties by our inventors.
19         What it does is creates a remote monitoring
20 system, so you put an electrochemical sensor within the body
21 and you have a battery on top of it, a radio transmitter.
22 And you essentially carry around something that looks like a
23 cell phone. So it is pretty much constant, periodic, every
24 five minutes or so, measuring your glucose levels, rather
25 than several times a day.

18

1          That is the technology. I would have to say the
2  technology itself is somewhat complex, because
3  electrochemical sensors are pretty complex. And you are
4  talking about combining different fields.
5          THE COURT: Mr. Doyle.
6          MR. DOYLE: That latter point would be the point
7  I would make, Your Honor. More complex than the typical
8  pharmaceutical case, because this is a combination of an
9  electronics case and biologics case. So you have got
10 combinations of two complex areas and the interface between
11 two complex areas.
12         THE COURT: All right. Fortunately, Ms. Nerozzi
13 is a biochemist and my other clerk is an electrical
14 engineer. So it helps.
15         We will set aside a day for Markman. Does that
16 seem reasonable under the circumstances?
17         MR. DOYLE: Yes.
18         MR. HURST: That seems fine, Your Honor.
19         THE COURT: So as I have indicated, close of
20 fact discovery, the date proposed is acceptable to the
21 Court.
22         I want to hear now from both sides as to
23 whether -- clearly the plaintiff believes this is realistic.
24 I want to hear from DexCom on it.
25         MR. DOYLE: I would suggest that we perhaps move

19

1  it -- it appears that the schedule was put together by
2  Abbott with the idea that discovery cutoff would follow one
3  month after the claim construction. That seems like a
4  logical spot for it. So I am wondering, with the change to
5  October 24th for the claim construction hearing, a decision
6  by November 24th, maybe we make fact discovery close at the
7  end of the year, around December 31.
8          THE COURT: The only concern I have about that,
9  and not having the Markman hearing at least closer, perhaps,
10 to the completion of fact discovery, is I don't want to have
11 a re-do. I don't want to have new information discovered
12 that may be pertinent to Markman and have to come back again
13 and re-do that. That is my thinking on how I approach those
14 things. I am willing to flex.
15         What is your view?
16         MR. HURST: Perhaps not until the end of the
17 year. Maybe another month, to November 20th.
18         THE COURT: Okay.
19         MR. DOYLE: Yes, Your Honor.
20         THE COURT: We will do that, then.
21         MS. GRAHAM: If I might just mention something,
22 Your Honor, so people on both, both my co-counsel and the
23 other co-counsel are thinking about it. The thing for
24 everyone to keep in mind here is then the sequencing and the
25 date. I always back up from the date we are going to have

20

1  the summary judgment briefing and giving Your Honor enough
2  time. So everybody needs to realize that we may be looking
3  at jumping up the expert dates a little bit, and then to
4  have the summary judgment briefing completed in time.
5          THE COURT: I am prepared to have counsel meet
6  and confer and discuss this part of the schedule, in terms
7  of the expert reports and the cutoff of expert discovery,
8  and make a proposal to the Court, rather than trying to
9  flesh that out at the moment. It may be that you want some
10 time to talk about it.
11         MS. GRAHAM: We can do that. I think we would
12 be able to work it out.
13         MR. DOYLE: Now that we know the big dates, that
14 should be pretty easy to do.
15         THE COURT: If you submit something in terms of
16 the -- let me give you this date. March 16 at 10:00 o'clock
17 for the TC, the teleconference on summary judgment. Then
18 you can work out -- I think you appropriately set an
19 abbreviated briefing schedule, letter briefing schedule for
20 those letters requesting permission.
21         MR. SHAW: Your Honor, you would like the
22 letters to be finished a week before that teleconference.
23         THE COURT: Exactly, Mr. Shaw. Thank you.
24         So, then, I would set the cutoff for filing
25 issue or case-dispositive motions that are permitted to be

21

1 filed at April 2, or two weeks from the Court's decision,
2 assuming -- should the decision come after the
3 teleconference, whichever is later. You brief under the
4 Local Rule, rather than the type of schedule you have
5 suggested. I think the Local Rule accommodates. It may be
6 that the Local Rule may change. It may expand the briefing
7 schedule in patent cases, I don't know.
8         The District Court Advisory Committee is in the
9 process of re-doing our Local Rules. So we will see what we
10 come up with.
11         I am going to eliminate the Daubert
12 teleconference. We have just not been using it. Counsel
13 have uniformly, almost, suggested that -- we have them in a
14 number of the older schedules that are running around. We
15 are taking them off the schedule. What we are doing is
16 taking care of Daubert matters at the PTC, the pretrial
17 conference. The lag between my pretrial
18 conference and the start of trial provides sufficient time,
19 should we need it, to convene a hearing on Daubert, an
20 evidentiary hearing, should one be needed.
21         So we have just not been doing Daubert on the
22 phone.
23         So the briefing schedule, the type of briefing
24 schedule that you have proposed is fine with me, as long as
25 whatever you propose at the end of the day is consistent

22

1 with this. It doesn't have to be exactly these dates.
2         Your joint proposed pretrial order will be due
3 August 13, '07, by the close of business. There is a form
4 of order on the Court's website. Please download it and
5 follow it.
6         The pretrial conference will be the 10th day of
7 September at 10:00 o'clock. We will likely convene an
8 informal session of the Court. It will be a conference.
9 But we will probably do it in here, and I will sit down
10 there, just so we will have space.
11         Trial, as I have told you, October 9. Given the
12 number of patents, it strikes the Court in its experience
13 that ten days is not an unreasonable number of days to
14 allocate to trial.
15         Let me say a quick word about discovery
16 disputes, which, of course, given the fact that we only have
17 one Magistrate Judge, who, because of her incredible
18 scheduling and talents, not that she doesn't have talents in
19 these areas as well, but in acting as a neutral in mediation
20 and other types of ADR, she spends a lot of time doing that,
21 so she doesn't do that much of the District Court's pretrial
22 work, if any. I will speak for me. I handle my own
23 discovery disputes to a point.
24         The way you bring them up is having one or both
25 parties call. We will get a date for a teleconference. 48

23

1 hours in advance of that date, you will be told I must have
2 a letter of no more than two pages, and it must be
3 nonargumentative, nonargumentative. You can outline for me
4 what the nature of the issues are. And we will get on the
5 phone and talk about it. If I am feeling uncomfortable
6 about ruling because I either need to think a little more
7 about it and maybe want to read some cases you have cited to
8 me during the conference or whatever, I will do that. If I
9 am feeling even more uncomfortable and feel that maybe I
10 would benefit from some letter briefing, I will let you do
11 that.
12         Those briefs usually end up being anywhere from
13 two to five pages.
14         If I am really uncomfortable and feel motions
15 practice is needed, that will be allowed.
16         I expect and require that counsel are the main
17 settlers of disputes along these lines. I expect them to
18 occur. Especially in complex, high-stakes civil litigation,
19 they are going to occur. I know that. Sometimes it's just
20 going to be necessary to involve the Court.
21         I let you do that with me three times. After
22 that, then I am going to send you to a special master. Of
23 course, your clients will have to pay for that service.
24         I think we have covered all of the, to the
25 extent that we need to today, all of the important dates in

24

1 the life of this case. Counsel are going to be left to go
2 over some additional things.
3         It is your turn now to talk to me about whatever
4 else it is that is on your minds.
5         Mr. Hurst.
6         MR. HURST: There is one issue we would like to
7 address, Your Honor.
8         As we mentioned in the joint status report,
9 Abbott is considering filing a motion for a preliminary
10 injunction to avoid the launch of DexCom's product, which we
11 believe to be an infringing product.
12         We served a deposition notice on February 2nd
13 for a 30(b)(6) witness to get the details of that product.
14 We want authenticated, admissible, definitive proof of
15 infringement so we can support our motion for a preliminary
16 injunction to the extent the client decides to go forward,
17 which we expect it to.
18         We noticed it up for February 21st. Because of
19 the positions that DexCom was taking at the time, they
20 declined to produce anyone. And so I am worried that their
21 launch is coming in the next few weeks. I want to avoid the
22 mad scramble that will occur if that happens when I have to
23 rush to the Court looking for discovery, filing emergency
24 motions, because this is the situation we are facing.
25         DexCom got approval in May of '05 for an

25

1  expedited application for its product to be approved by the
2  FDA. The FDA targets 300 days for making decisions on their
3  expedited applications. Your Honor, 300 days brings us to
4  the middle of March of '06, when the FDA, if they meet their
5  own stated goals, which they are trying to do 70 percent of
6  the time, they could be approving DexCom's product for
7  launch within weeks.
8      What makes us more nervous about this happening
9  in the next couple of weeks is we have asked counsel for
10  DexCom for an assurance that they won't launch before March
11  28th, let's say, so we would have a little time. They
12  declined to give us that assurance. Moreover, our sales
13  force right now are being contacted by DexCom. They are
14  recruiting our sales force.
15      We got to believe that they know now that launch
16  is imminent. And I understand counsel said it is uncertain
17  and he doesn't know for sure and nothing is sure with the
18  FDA. All indications are, Your Honor, that it is happening
19  very, very soon.
20      So I would like to get a 30(b)(6) deposition so
21  I am in a position to file my papers as soon as possible so
22  if Your Honor -- I am requesting a 30(b)(6) deposition on
23  the details of DexCom's product within the next ten days, if
24  that is possible.
25      THE COURT: Mr. Doyle.

26

1      MR. DOYLE: First, let me discuss the FDA
2  process and where we stand in that, Your Honor.
3      If only the FDA were as scrupulous as this Court
4  is in adhering to its schedule. It's just not the case.
5      Our FDA situation is essentially identical to
6  what it was when this case was filed on August 11. We have
7  had a lot more interaction, but no material step has
8  occurred yet within the FDA at this point.
9      The next thing that could happen would be the
10  FDA will make a decision as to whether to refer our product
11  to what's called panel review or not panel review. That has
12  not happened.
13      If it goes to panel review, then we would be
14  lucky to have a product any time in 2006. Thus, again, the
15  reason -- and I apologize, Your Honor, I did not mean any
16  offense to the Court -- it just seemed impossible to me,
17  given, still, the significant likelihood that we will go to
18  panel review, that I could honestly state to your Court when
19  we would be prepared to make disclosures and to agree to a
20  schedule. That's why we took the step that we did.
21      If we are fortunate, and we avoid panel review,
22  then sometime within a month or two, my understanding is, we
23  will get hopefully what is called an approvable letter.
24  Once DexCom has an approvable letter, there is then another
25  one or two-month period in which DexCom has to engage in

27

1  extensive discussion, negotiation, with the FDA, to work on
2  product labeling, all kinds of other details involved with
3  actually launching a product, and get all that approved by
4  the FDA.
5      Only then would there be an approved letter, and
6  then, of course, despite the fact that DexCom is
7  optimistic -- and, yes, they are trying to do some hiring in
8  the process of getting ready to hopefully have a product
9  some day. The idea that we should spend our time or Abbott
10  should spend their time right now taking a 30(b)(6)
11  deposition, until there is an approvable letter -- there
12  will be plenty of time for that once there is an approvable
13  letter. An approvable letter is a material event that,
14  DexCom is a public company, will disclose, so Mr. Hurst and
15  Abbott will know about it as soon as DexCom knows about it.
16      So I would, given that process and where we are
17  in that process, I think the concern is really a bit of a --
18  I would suggest, Your Honor, it is not completely genuine in
19  that Abbott knows this FDA process better than DexCom. And
20  I think again, just as they filed the case on August 11, way
21  before there was any realistic possibility we would have a
22  product, that now they want to start discovery way before
23  there is any need to do so, especially with the motion
24  pending.
25      Again, the approvable letter will lead to at

28

1  least the 30-day period that counsel is asking for. That
2  will be disclosed.
3      THE COURT: So there's at least 30 days between
4  the issuance of the approvable letter and the --
5      MR. DOYLE: Exactly, Your Honor. That is best
6  case, if everything goes well and we get a lot of attention
7  from the FDA. And the FDA is a busy place, so we can't
8  really count on that.
9      THE COURT: Let's hear from Mr. Hurst.
10      MR. HURST: Your Honor, what I didn't hear is
11  any prejudice to us having a 30(b)(6) deposition. Discovery
12  is now open. It's been open since February 2nd. I properly
13  noticed up a 30(b)(6) deposition for February 21st, which
14  they just declined to come to the deposition. And I guess I
15  would like to proceed with discovery.
16      In terms of the timing of things, two things
17  that Mr. Doyle said. He said there is a possibility that
18  the FDA is going to order a panel review, which will delay
19  things a lot. Abbott is in front of the FDA on a similar
20  product right now. We have already heard from the FDA,
21  informally, that a panel review will not be necessary for
22  the kind of labeling that DexCom is asking for. I imagine
23  they got the same indication from the FDA.
24      Second, the timing between an approvable letter
25  and an actual launch, I am not a regulatory expert, I have

29

1   talked to my regulatory folks, they say, yes, sometimes it
2   takes some time so you will have notice. But sometimes, if
3   you work really hard with the FDA, you can move it so that
4   the actual launch occurs very near the time of the
5   approvable letter.
6          All I am trying to avoid is an absolute, mad
7   crunch. There is really no prejudice to DexCom for me to go
8   forward and take a single-day 30(b)(6) deposition on the
9   details of their product.
10         THE COURT: I am going to order the deposition.
11  I did not hear from Mr. Doyle, as you correctly pointed out,
12  that there would be any prejudice to DexCom in participating
13  in the 30(b)(6). Having heard none, I will order that the
14  deposition occur. What was the time frame?
15         MR. HURST: I asked for the deposition within
16  the next ten days.
17         THE COURT: Counsel can meet and talk about
18  this.
19         MR. DOYLE: Right. I will have to find out --
20         THE COURT: You have to find a representative.
21  But it must be within a reasonable period of time, and must
22  comport with the spirit of what counsel is requesting, a
23  sooner rather than later, as we bandied that term about,
24  deposition would be required.
25         MR. DOYLE: Yes. Do we also have an

30

1   understanding that the subject matter of this deposition is
2   as stated to Your Honor? Because it is very different than
3   what had been stated to us before. What counsel has been
4   stating to us is that he wanted to do discovery, or Abbott
5   through Mr. Hurst has been stating to us, wanted to do
6   discovery about our FDA process and where we were in that.
7   And Your Honor had already declined to allow that discovery.
8          THE COURT: I did. Let's pin this down.
9          MR. HURST: The deposition notice has two parts,
10  Your Honor. Topic No. 1 was for each accused product
11  describe in detail the structure, function, use and
12  operation of such products and their component parts,
13  including the materials used to make the component parts and
14  the dimensions of those parts. That was Part 1.
15         Part 2 related to the discovery on the status of
16  their FDA approval efforts. I did not understand you to
17  deny our motion for discovery on that but rather to delay
18  it. We asked to have it heard earlier rather than later,
19  but you declined that request.
20         THE COURT: I think your request this morning
21  was tailored to --
22         MR. HURST: No. 1, it was.
23         THE COURT: We will confine it to that.
24         MR. HURST: Thank you, Your Honor.
25         MR. DOYLE: Thank you, Your Honor.

31

1          THE COURT: Okay. From DexCom, does DexCom have
2   any matters it wishes to discuss beyond those we have talked
3   about? Again, I think there is a motion to stay as well.
4   One of the patents has been put in for reexam.
5          MR. DOYLE: All four have been put in. If the
6   fifth patent is the most recently issued patent by the
7   Patent and Trademark Office, that is in the same family as
8   some of the asserted patents, then we will be seeking
9   reexamination of that patent as well, Your Honor, based on
10  our review.
11         THE COURT: When did they go in?
12         MR. DOYLE: Our applications, one was filed in
13  late December, and the other was in early January.
14         THE COURT: Okay.
15         MR. HURST: Your Honor, Ms. Graham pointed out a
16  concern that I hadn't anticipated when we were talking about
17  the scope of the deposition.
18         The Topic No. 2 actually does address the timing
19  of DexCom's likely approval and their current communications
20  with the FDA. What Ms. Graham pointed out to me, which I
21  hadn't --
22         THE COURT: We will include Topic 2 in the
23  30(b)(6).
24         MR. HURST: Thank you, Your Honor.
25         MR. DOYLE: Your Honor, about that, as I have

32

1   described, we are a public company. Any material event that
2   occurs, we have to disclose it immediately. So again, it
3   seems to us to have them -- what they want to do is they
4   want to ask us to speculate as counsel here has speculated,
5   well, Abbott thinks that maybe the FDA is thinking because
6   they have got an informal suggestion, I just don't
7   understand the point of that, other than to address Abbott's
8   angst about something where there need be no angst, given
9   the FDA's process and what everybody knows about it, just
10  trying to allow our company to focus on getting the FDA
11  approval rather than spend time in deposition.
12         THE COURT: Certainly.
13         MR. HURST: Your Honor, I just want to know the
14  subject matter of the communications. The FDA has a
15  guidance that says they communicate with the applicants
16  every 30 days. In practice, they do do that. Right now,
17  DexCom knows whether there is any major hurdles as to
18  whether or not they are going to get approved. In order to
19  prepare for a possible motion for preliminary injunction, we
20  would like to know the timing of that motion. It is not any
21  burden on DexCom.
22         THE COURT: I will permit it. Anything else?
23  Counsel, we are adjourned.
24         (Conference concluded at 11:50 a.m.)
25  Reporter: Kevin Maurer

# EXHIBIT B

**EXHIBIT B**

**TRANSCRIPT OF CONFERENCE CALL WITH INVESTORS FROM**

**FEBRUARY 27, 2006**

Today's conference is being recorded.  At this time all participants are in a listen only mode.  Following today's presentation, we'll conduct a question and answer session. Instructions will be given at that time for you to queue up for your questions.  Now at this time, I would like to turn the conference over to Andrew Rasdale, Chief Executive Officer.  Mr. Rasdale, please go ahead.

Mr. Rasdal:  Hi and good afternoon and thanks for joining us.  I'll let Steve Kempfer, CFO, start out with some initial remarks.

Mr. Kempfer:  Hello everyone  and thank you for joining the call.  I just would like to repeat the Safe Harbor statement.  We will be making forward looking statements about our business, regulatory areas and other areas of the company, so please refer to our 10K as well as all of our other SEC filings for a full discussion of the Risk factors.  Thanks and I will turn it back to Andy now.

Mr. Rasdal:    Great.  What I would like to run through today here in terms of an agenda is first talk about our short-term sensor program, talk about the regulatory status, our clinical, technical development progress and our preparedness for any potential commercialization, I would like to spend a little time updating on the long-term program, provide an overview of our litigation and intellectual property status.  I'll then turn it back over to Steve and let him go into more detail through the financial results and then wrap up with a few closing comments and then open up for questions.  So, at this point, I would like to start on the short-term update.  At this time we have nothing material regarding the umm, from the FDA regarding our PMA report at this time.  We still hope for a decision from the FDA regarding the approvability of our PMA for the STS by early Q2, as we previously guided.  Although we cannot predict the FDA's decisions, we remain very optimistic.  Also, on a semi-regulatory front, our request for a waiver for our STS to transmit in the mix band frequency was granted by the FCC.  We're thankful for the FCC's consideration and decision on the matter.  We'd also like to take time just to thank the folks. We're very appreciative of the effort by clinicians and patient advocacy groups to help educate the FCC on the potential impact of continuous glucose monitoring may have on people with diabetes.

From a clinical and technical standpoint, we had an article authored by our clinical investigators from our pivotal clinical study for STS which was pure reviewed published in the January, 2006 edition of diabetes care publication of the American Diabetes Association.  The article provides the full results from the study and highlights the potential clinical and economic impacts of continuous glucose monitoring.  Obviously, we're all excited to have the article this early, having a peer review article citing clinical outcomes related to continuous glucose monitoring will be very helpful to ours and others future regulatory reimbursement efforts as well as, ultimately, providing our field force an important educational tool.

We've also submitted data from our 7-day trial to be considered for publication and presentation at the annual scientific session for both the ACE meeting and the American

Diabetes annual meeting for 2006. We're still on track and intend to submit a PMA supplement for approval after an FDA approval for our PMA for the STS's received. Since we completed our 86 patient 21-day study for the 7 day STS last July, we continue to make considerable technical progress we believe improves the performance and user ability of the product. We may conduct a short small registry to incorporate these improvements into the PMA submission, when and if we submit that.

Based on conversations with patients and physicians in our ongoing trials, we continue to believe a 7-day short term sensor may offer an even higher level of convenience and disease management and further differentiation for DexCom. We're excited the acceptance of the 7-day sensor is very attractive to the company from a profitability perspective as we do not expect the 7-day STS to cost much more to manufacture but do expect some pricing premium over the 3-day short term sensor.

We had talked on our last call that we had initiated some feasibility studies to further explore what may be required for a replacement claim labeling from the FDA. Towards the end of last year we had completed, we enrolled 35 patients in five feasibility studies at 3 US centers to evaluate the study design and sensor performance related to seeking replacement claim from the FDA. We believe we now have a better understanding of the sensor performance and the studies that are required for replacement labeling. However, there is still no clear guidelines from the FDA for replacement claim nor is there any clear predicate to study or device. However, we intend to file an IDE with the FDA for a replacement claim to start a study sometime after we have received a decision regarding approval of our current STS PMA.

We are also currently enrolling a trial that allows us to collect data on or gain experience with patients using the STS continuous for a 3-month period or 90 days of consecutive use. If fully enrolled, the study could have up to 400 patients at 20 US centers. We've currently enrolled and enrolled approximately 130 patients at 7 US sites and are gaining a great wealth of both data and experience with a product having people use it for much longer periods of time.

We've continued to prepare for potential commercialization should we receive FDA approval. It's our desire to launch the STS as soon as possible if we receive approval. Back in November we hired Rod Kellogg as our vice president of sales to build our field sales and our customer service organizations. We've hired our first regional sales managers and currently are conducting interviews with potential sales representatives. We're very pleased with the quality of potential candidates that have approached us and we expect to have an initial field force in place when and if we receive FDA approval.

We've also made some significant internal progress. We've installed the infrastructure including the information technology systems required for us to receive, process, ship, field and service customer orders if we receive approval. We've continued our focus through Q4 on process development and optimization of our manufacturing to allow us to reliably scale production if and when we receive approval.

In the 4th quarter of '05 we made a significant investment in materials and supplies that would be required to build product if we received approval. We streamlined and solidified the processes for working more effective and efficient with our key partners such as AMI Semi-

conductors who supplies our AZTEC to us and in Q-4 we invested in numerous trial production runs to test and to validate our manufacturing processes to make reliable products. These products are essentially all consumed in an in-vitro animal testing or human clinical studies during the same quarter to insure consistent and reliable performance in the actual situation of in vivo use.

Related to our long-term censor program we've continued to make technical progress on the program. We continue to be pleased with the new innovations especially the new biomaterials we mentioned on the last call that we made related to our materials that may improve performance. We are currently evaluating the impact of these innovations on our G-3 platform and animal studies showing extended use. We plan to fully evaluate these potential improvements as we mentioned before, potentially including human feasibility trials outside the US before enrolling any additional patients in our US IDE that is currently open.

Clearly as we continue to raise the level of performance of our STS patent form including demonstrating the ability of our short-term sensor perform reliably over longer periods of time. We also raise both the internal and external expectations for the performance of our long-term sensor program.

Related to our current litigation with Abbott, Judge Sleet, the presiding Judge in the case, held a scheduling hearing on the litigation on February 23rd. He did not and has not ruled on our motion to dismiss the case. He did set a trial date for October 2007. Thus, without any delays, it will be approximately 20 months from now when we begin arguing the case in court.

We also filed a request with the US Patent Office for the re-examination of all 4 patents cited by Abbott in their complaint. Based upon our legal counsel's analysis of these patents, we feel there is ground for re-examination of those patents. However, this no guarantee that the US Patent Office will grant our request for one or any of those for re-examination. We'd expect a decision regarding our request for re-examination in the next 90-days or less. If our request for re-examination is granted, we'll have more to say at that time about the possible outcomes and implications. In the meantime, we have filed another motion to stay the case based upon our request for re-examination.

Regardless, we refuse to be distracted from our passionate commitment to obtain approval for the short-term sensor and to make it available as soon as possible for people with diabetes who may benefit from this important new technology. With that, I would like to turn it over to our Chief Financial Officer, Steve Kempfer to comment a little more fully on the financial results from the quarter as well as the year.

Steve Kempfer: Thanks, Andy. As Andy mentioned I will go really briefly through the financial covering first the 4th quarter and then speaking about the full 2005 fiscal year.

DexCom today reported a net loss attributable to common share holders of 12.1 million for the 4th quarter of 2005 or a loss of 48 cents per share compared to a net loss of 4.6 million for the 4th quarter of 2004 or a loss of a $1.98 per share for that period. The per share numbers are not directly comparable due to the relatively low level of common share adult

standing in 2004 that was prior to the conversion of a preferred stock that happened around our IPO.

Research and development expense excluding stock base compensation increased 7.7 million to 10.7 million for the 4th quarter of 2005 compared to 3.1 million for the same quarter in 2004.    As we are still a development stage company, our R&D includes manufacturing, clinical and regulatory as well as development and engineering.  The increase was primarily related to 6.2 million increase in our manufacturing expenses and a 1.5 million increase on the development side.  Included in the manufacturing related costs were 5.7 million in higher material procurements to support our repeated use study that Andy mentioned as well as for materials received in preparation for volume production.  Again, as we are a development stage company we are still expensing all of our materials.

The 5.7 million material expensing includes approximately 2 million in materials and supplies that were on hand at the end of the year as well as the recording of a 2 million dollar loss on firm purchase commitments for some electronic materials scheduled for delivery in early 2006.  This purchase commitment is related to an initial quantity of some on order electronic materials that we currently do not plan on recovering in our initial sales.  These costs should decline rapidly as we scale our manufacturing operations.

The 1.5 million in higher development expenses are primarily associated with increase compensation as we continue to build up R&D team and for design costs related to the design of production tooling and fixtures.  Our SG&A expenses included stock base comp, increased 1.1 million to 1.5 million for the 4th quarter of 2005 compared to 440K for the 4th quarter of 2004.  Increases here were in two main areas approximately 300,000 in initial sales and marking expense where we had none in 2004 and approximately 400,000 in public company expenses, insurance, legal, board expenses, accounting, Sarbanes-Oxley, that sort of thing.

Stock base compensation expenses for the quarter increase is 12K to 316K for the 4th quarter of '05 compared to 304K in '04.  These costs were related to our pre-IPO stock options.  As you know, this treatment will change when we adopt the new FAS 123R as of January 1 of this year.

Our interest income increased approximately $500,000 in the 4th quarter of 2005 compared to 2004 as we earned interest on the cash balances raised during our IPO.  For the full year DexCom reported a net loss of 30.8 million for 2005 compared to a net loss of 13.9 million for the full year in 2004.  The loss per share was $1.63 for 2005 compared to a loss per share of $7.51 for '04.

Again, those figures are not directly comparable due to the accretion and later conversion of our preferred stock.  We did provide a performance disclosure as in the past in the notes to our financial statements that provide additional clarity.  So, please refer to our 10K for additional discussion on that.

R&D expense excluding stock based comp for the year increased 13.3 million to 25.5 million for 2005 compared to 12.2 million for 2004.  The primary drivers of this increase were again, 7.7 million in higher manufacturing expenses, 3.7 million in higher development expenses, and 1.9 million in higher clinical and regulatory expenses.  As we scale our operations

in these value added areas after the completion of our pivotal trial and the submittal of our first PMA to the FDA. Included in the higher R&D spending were about 6.4 million in material procurements, most of which hit the 4th quarter as discussed earlier and 3.4 million in high compensation expenses as we continue to build our capabilities, about 1.2 million in tooling and fixturing design costs, and a million dollars in higher clinical and regulatory primarily related to our STS pivotal trial.

As mentioned earlier about 4 million of the materials expenses reflected in our R&D expense are either on hand or on order. As DNA expenses, excluding stock base comp, increased 3.7 million to 5.1 million for the full year of 2005 compared to 1.4 million for 2004. As with the quarter the full year increases are related to initial marketing expenses of about 1.4 million for 2005 where we had none in 2004 and 1.2 million in increased expenses related to operating as a public company.

Our stock based compensation for the year was up a million three to 1.8 million for 2005 compared to 449K in '04. Again, these will change going forward as we implement FAS 123R. Interest income increased approximately 1.5 million for '05 as we invested the proceeds of our IPO and as short-term interest rates continue to rise. We ended 2005 with a very strong balance sheet including 50 million in cash and equivalents so the proceeds from our IPO are essentially sitting in the bank at year end.

Our cash usage from operating activities from the year was about 22.5 million. That includes our 30.7 million dollar loss. So, if you can imagine we had fairly large payables at year end. The annual loss also includes 2.7 million in non-cash charges for a depreciation and amortization. Our cash flow from investing activities other than the purchase and sale of securities related to our cash management program included about 4.7 million in purchases of property, plant and equipment as we significantly increased our manufacturing capacity.

As you know, we continue to believe that our vertical integration here at DexCom allow us to scale very quickly for launch and be able to capture upside demand should it develop. That's it for the prepared financial comments and I will turn it back to Andy Rasdale now for the wrap up.

Andy Rasdal: Thank you, I'd just like to wrap up as we sit here looking into 2006. We're obviously anxiously awaiting a decision from the FDA on the approvability of our short-term sensor STS PMA. In the meantime, we're developing the capabilities to transition from a purely development company into a more commercially focused organization. We've made substantial progress in preparing our manufacturing of our STS to potentially do that in higher volumes if and when we receive approval. We have hired a very senior experienced sales leader, are busy building a sales marketing customer service organization. Our expanded repeated use trial is giving us wider exposure to a greater number of Diabetes Centers, endocrinologists, diabetes education patients and as a result giving us more experience and feed back related to the product real time.

Still, we continue to keep focused attention on our future pipeline. We understand that to be important to growing a franchise. We still plan to submit regulatory approval of our second generation 7-day STS once we receive an answer regarding the approval of our first PMA. We believe we have a better understanding of a sense of performance and a

study design to seek replacement claim labeling from the FDA and intend to file an IDE sometime after we receive a decision of our first STS PMA as well. In the end, we're all real excited and committed to effectively introducing our STS products to people with diabetes if and when we receive approval from the FDA.

So that's the end of the company's prepared comments, we'd be happy to take a couple of questions.

And today's question and answer session will be conducted electronically. You may do so by pressing a star key followed by the digit one. If you've been utilizing your mute button, you want to make sure that is disengaged. Again, star one and we will pause just a moment to assemble the question roster.

Our first question will come from Wade King with Montgomery & Company.

Hi, guys, can you hear me.

Yes.

Thanks for the update. A couple of follow-up questions, if I may.

1. You mentioned a couple of things that relates to the buildup of your sales force and the event you get an approvable letter near term. Can you give us any idea in addition to the lead person to head up the sales effort as to the number of sales reps you've hired to date?

**Answer:** Sure, we've, I won't be specific on the numbers we have our sales guy as we indicated, we have hired our first team of regional managers and they are in the process as we said of conducting interviews and finalizing candidate selection.

Okay, maybe I can ask just follow-up related question. Is it a reasonable assumption to figure that you would have up to 20 reps in place to represent the sales force infrastructure by the end of March or early April?

**Answer:** You know it is the timing of FDA approval, if you get approval, always a bit uncertain, it's a bit of a balancing act. As we said previously, it is our intent to be in a position to launch when and if we receive approval with 20-30 people totally in the field, I think that would consist of managers, sales representatives and as we've already spoken about clinical educators and specialists to also help support the product on a technical level.

Okay. Very good. You mentioned a variety of investments that you have made to date as it relates to preparing for production and launch. Could you give us an idea of whether you have actually started to accumulate finish goods at that the company in terms of your production based on all these investments or is that something that is in the hopefully near future.

**Answer:** I think that will probably be a more appropriate comment in the future after we receive approval.

Okay. Very good and last question, please. Thanks for the update on all the activities as it relates to the additional filing you would hope to make assuming you gain approval for the short-term sensor. Can you tell us are there additional claims that you hope to

include in a follow-up PMA application for the short-term sensor beyond the increase from 3 to 7-day labeling or are there also additional claims you will be seeking at any follow up application?

**Answer:** Sure, I think we are obviously conducting a study that may include up to 20 centers and 400 patients. There is a good pool of data that may submit, that may support a number of different claims coming out of the things we've been very specific on and probably conducted the feasibility trials as our desire and intention to seek replacement claim labeling from the FDA. We obviously have to get such a study of design approved and conducted successfully. We've always spoken that at some point we would like to seek a clear indication for pediatric under 18 usage as well.

So, once again I appreciate that detail but in the expectation of the almost immediate follow-up to the initial decision from the FDA and the short-term sensor with 3-day labeling when you submitted a follow-up soon there after to that decision, hopefully, will there be additional things other than a 7-day claim that you will be seeking.

**Answer:** Not knowing exactly what the labeling will come out from the FDA at this time, it would just the first filing would support the 7-day.

Okay guys Thanks for the update.

**Answer:** You bet.

Our next question comes from Tom Gutterson with Piper Jaffrey.

Boy it is all about timing for the FDA isn't it. Wade asked the key questions, I'll just cross those three off and ask my last question and, that is, any discussion between you and the FDA that would help us. Any new news that would help us understand whether or not there is going to be a panel review or not?

**Answer:** Nothing material from us and the FDA would think at this point, we're really just waiting a decision. As we said previously regarding panel, we have not and have not been notified about a need for us to go to panel for this device. But, the FDA only has an obligation to notify you if and when you're going to panel. They do not have an obligation to tell you, you're not going to panel, nor would I expect us to ever hear such a thing, you know, formally. So, we've not been notified to date of the need for that, but again, we cannot formally rule that out.

Okay. Thanks. You guys were fast and brief and I will be fast and brief. Thank you.

**Answer:** Thanks, Tom.

Our next question is up and enter William Blair.

Good afternoon. Maybe it would be helpful to talk a little bit more about the activities in the 4th quarter on the manufacturing side and you went through that pretty quickly, I think Steve, in the terms of the amount of materials that you guys brought in and how much of

that you went through in the 4th quarter and testing versus how much may kind of be in the queue, I think it was 2 million there. Is that right?

**Answer (By Steve Kempfer)**: Yes, I can give you a little more information on that piece. Our manufacturing expenses you know for the quarter were 7.7 million higher than in the previous year. The R&D spending included 6.4 million in material procurement, of which about you know 2 million was on hand at the end of the year and 2 million was related to a loss on purchase commitments, that is as materials coming in early part of 2006. So, essentially about 4 million remains out of the 6.4.

Okay, so you went through about 2.4 million in manufacturing increase expense in the 4th quarter. That 2 million related to these, is it electronic components that you don't expect to be using? Were they for the LTS, was that STS?

**Answer (By Andy Rasdal):** Yeah, and these are electronic components that we had a commitment on that will support some initial launch quantities for us. We expect as we wrap up our manufacturing operations for those costs to decline rapidly.

Okay, but the 2 million, you said you don't to expect to recover them? Is that the language? There was 2 million components that you didn't expect to utilize early in the launch and you sound like you were writing those off or what was that?

**Answer**: Yeah, it was 2 million of materials that we don't plan on including in our initial pricing with the customer.

I guess that I don't understand what that means and it is probably me, but does that mean that you are not going to be able to sell that eventually, or are your not going to sell it in the time frame you originally thought you'd sell it so and so you have to expense it.

**Answer:** We'll be able to sell, we believe we'll be able to, if we seek approval to sell those components. But like anything initial purchases, especially electrical products maybe a little more expensive upfront. So we expect to be able to recover some portion of those and maybe all of them but the accounting treatment right now, assumes we won't.

Okay, so is like a window in which you had to assume you would be able expense it or to utilize it or otherwise you'd expense it later?

**Answer:** Yes.

Okay, and then, so the increase activities, what can you share with us, what is your current capacity if you had to start selling tomorrow for the STS?

**Answer:** We haven't tried anything related to capacity at this point. You know, if we assume approval, again, it has always been our intention to launch very shortly thereafter and I believe we'd be in a position to do so.

Okay, I don't think I noticed any guidance from you guys for the year, but can you give us any thoughts on what manufacturing expense or R&D expenses, SG&A could be for either the first quarter or the year and I know that depends on the FDA, but just kind of what your take is at this point?

**Answer:**  Yes, what were not and are not providing specific financial guidance on revenue expenses.  Being in the fourth quarter of '05 we made a level of investments, especially in our materials and/or manufacturer processes that we believe is representative of being ready to support the initial launch of our product should we receive FDA approval.  So we expect as we move into the first and second quarter that as we start to scale related to revenues, our operations expenses will become more efficient but that would be offset, initially, at least by additional investment on the sales and marketing side.

Of course.  And, last question, Andy in terms of next timing step for FDA, is there a hard deadline that you expect in terms of a reuse cycle, I thought there was a date coming up here shortly for the 180 cycle clock.

**Answer:**  There probably is related to the dates but, again, the FDA can keep to their own calendar.  So we don't have any exact hard date that were planning to have a decision on yeah or nay.  As you know, we've always guided in general, PMAs take about a year, plus or minus some time frame and that puts us out towards the beginning of Q2 and I think we have been pretty consistent with that in the past but there is no date that we expect they're going to give us an answer one way or the other.

Okay.  Thank you.

Our next question comes from Sarah Michael Moore with Cohen.

Good evening.  Thank you.  I guess looking a little bit longer term, Andy, I know you want to have about 20-30 support people in the field at launch.  But can you give us an idea in terms of just over a 1-2 year period where you see that support side to be to?

**Answer:**  Bigger, I hope.  You know, that is always contingent upon, you know, adoption and revenue growth and track of profitability.  I think that follows a pretty standard mode, if we get strong traction and the product is what we had hope it is, are able to grow revenues and then we will continue to divide up territories and hire additional reps based upon the need to better service and drive adoption to new segments of the population.  I can't predict what that will be like, as I said, hopefully, much bigger.

Okay, and with 20-30 person field force my guess is that you'd would focus on some of the large centers that, obviously, have big patient numbers and I'm just wondering in the terms of the centers that you target and, how many of those today, could you estimate that you have existing relationships with just from getting clinical trials and some of these other projects that you guys have been working on.  How much of a head-start do you have there with some of those influential decision makers.

**Answer:**  Yeah, Yeah, well I think one of the things that certainly changed the last environment from the last 4 or 5 months from our perspective is that we always felt that we always  would be a third into the market place and a follower and I think with the status of the two other people playing in that environment, if we receive approval in a timely manner from the FDA we may be the first to really commercially launch a product, is our intention.  The thing that changes because of that we are likely to have access to these big centers where we haven't had a presence commercially and as you know the field of continuous is a awful lot of momentum and interest behind it.  So, I really think all of the key centers have expressed their

interest.  We worked in a number of those and I don't know the exact number offhand, so I won't quote it, through clinical studies or discussions with them about appropriate clinical trial designs and so, the biggest thing that has changed is that we have the ability perhaps to get to these big centers fairly early and experience a continuous glucose monitoring and establish DexCom as a foundation for that and get their feedback early and make the required improvements.

Okay, that's helpful and, last would you just on the subject of reimbursement if you could just update us on your thoughts there and what you think the plan would be assuming that you are able to get a timely approval of the product.

**Answer:**  Yeah, sure, I think it is always convenient to build some of the expertise in-house.  We've always felt there were a number of things required for reimbursement for the category of continuous glucose monitoring.  You know, the first for us will be the approval so that there is significant adoption into the ranks so that we prove that this is useful and reasonably adopted technology so that payers can pay attention and then it's the normal thing, support of advocacy groups.  You are probably aware of the JDR initiative related to closed loop systems.  The first thing being to get continuous glucose monitors first available which means approved and second accessible which in my mind means reimbursement- and they are putting a lot of their weight and thoughts behind this which is, I think it is for all of us in the category and then to always have good peer reviewed, outcomes related publications, I think we are in a very strong position out with a publication in Diabetes Care.  Our first clinical trial we have the data from our 7-day and subsequent trials as we said we submitted to the scientific sections of ACE and ADA and hope for publication and we'll continue to lend that data related to outcomes for continuous not only to our efforts to seek reimbursement but that can be leveraged by other parties seeking reimbursement as well.

That's very helpful Andy, thank you.

Our next question is from William Plavanik with First Albany Capital.

Great, thank you.  Good evening.  I think there has been some question out there as to the whole RF signal.  Just, my question stems around you got the waive from the FCC on the first generation, is that different with the second generation, do you have to fully redesign the product, that is my first question.

**Answer:**  Nope.

So then any generation of product you would bring out falls under that waiver?

**Answer:**  That is correct.  Either the short term or the long term are finable.

Fantastic.  Secondly, if you look at commercialization of the product, yet compare and contrast which is seen with the player that has received the first approval out there, Medtronic, and kind of what their strategy has been, and what your strategy may be, and how those are different.

**Answer:**  I think I only have limited visibility if any to Medtronic Mini-Med's true strategy. It would appear and we can discern that they have launched into a very controlled manner, into a limited small limited numbers of centers to collect data and feedback and move

forward.  It would be our intention not to limit launch just to a handful of centers.  Obviously, we want to work methodically through them but it wouldn't be a matter of just launching through, you know, 10 or so centers and doing that.  We're really running our large repeated use trial where it may have up to 20 centers and 400 patients depending on how long it takes to get approval to continue to gain that kind of data and that experience and support reimbursement efforts and so forth on to that data.

Great.  That is all I had. Thank you very much.

Our next question comes from Caroline Corner with Montgomery Company.

Hi, thanks for taking my question.  I have a question first of all about the RF technology.  I've taken a look at some of the other diabetes care sites and there is a debate, it seems, between Infer Red and RF communication and with your technology,  is it possible to use them on airplanes.

**Answer:**  Yes, we believe so and we've tested to quite a number of requirements of interference and so forth with all of regulatory filings.

So any kind of interference from airplanes, cell phones, etc. you haven't found anything that would be a problem for diabetics using this system.

**Answer:**  Not that we're aware of at this time.  Of course, it is one of the reasons that we felt that it was most appropriate for this to file into the next band which is a frequency set aside by the FCC for licenses like this.

Okay, great. And then, just a follow-up question about sale force hiring.  You said that reps are approaching you to sell the product once you've got approval, have any of the reps coming from other diabetes companies, and if so, are you running into problems with the do-not-compete clauses.

**Answer:**  It wouldn't, it wouldn't be appropriate for us to pre-identify folks.  But our criteria for hiring people in the field are first and foremost a demonstrable track record of nothing but the highest level of performance not only in the current role but previous ones, strong diabetes related experience.  Realizing that with the exception of one company there is no other commercially marketed continuous glucose monitor so I do not perceive a lot of  conflicts as this will be perhaps one of the first of its kind.

Okay, great.  Thank you for answering my question.

And as a reminder for initial or follow-up it is star one.  We'll next go to Frank Dooter with Eric Gonset.

Hey guys, quick question on the marketing strategy.  Have you guys considered taking this into hospitals for continuous monitoring and also, how can that possibly play a role in getting reimbursement a little quicker.

**Answer:**  Sure, yeah we, like probably a number of other people, have read all of the recently rapidly evolving literature on the potential to improve outcomes with people in the hospital by more closely monitoring their glucose.  There's some good data obviously related to

people both with and without diabetes who may benefit better glycemic control post-operatively or post-traumatically, and, I think we will have more to say in the future but, clearly, that is an opportunity.  We see the potential to leverage our platform into the future with that.  And second, obviously, anything which shows reductions and length of stay has significant financial impacts and, I think, certainly from an economic standpoint making a faster more understandable argument for reimbursers.

Have you guys already considered a trial or designed one and, if so, the timing of that?

**Answer:**  Yeah, we are.  I prefer at this point I won't make any comment about the status of that program, other than to say that we remain highly engaged in that end.  I think, that what we have always done at DexCom is, if and when we have successfully conducted a series of trials that we think are meaningful and representative and either us or our clinical investigators, will speak to those as that is the most credible approach.

Okay, thanks you guys.

You bet.

And with that if there are no further questions, I would like to turn the conference back to Andrew Ragsdale for additional or closing remark.

Okay, thanks we appreciate everybody's attendance and participation today and, as I said earlier we're just anxiously waiting, as Tom noted, a decision from the FDA and, hopefully, in a favorable light being able to get on and hopefully begin to help people suffering from diabetes in earnest with what we hope is an important new intervention for them.

Thanks and good evening.

EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ST. CLAIR INTELLECTUAL          :
PROPERTY CONSULTANTS, INC.,     :
                                :
          Plaintiff,            :
                                :
     v.                         :  Civil Action No. 01-557-JJF
                                :
SONY CORPORATION, et al         :
                                :
          Defendants.           :

**MEMORANDUM ORDER**

Pending before me is a Motion To Stay Pending The Outcome Of Reexamination Proceedings (D.I. 202) filed by the Defendants ("Sony"). The Plaintiff ("St. Clair") opposes the stay.

In considering Sony's motion, I have read the papers submitted by the parties, The Patent Act of 1980, Robert L. Harmon's discussion of the Reexamination Procedure in his treatise, Patents and The Federal Circuit, (5th ed. 2001), and the four (4) District of Delaware cases cited by the parties, Freeman v. Minnesota Mining & Mftr. Comp., 661 F. Supp. 886 (D.Del. 1987); United Sweetener USA, Inc. v. Nutrasweet Co., 766 F. Supp. 212 (D.Del. 1991); Rohm & Haas Co. v. Brotech Corp., C.A. No. 90-109 (JJF), 1992 U.S. Dist. LEXIS 21721 (D.Del. July 16, 1992); and Gioello Enterprises, Ltd. v. Mattel, C.A. No. 99-375 (GMS), 2001 WL 125340 (D.Del. Jan. 29, 2001)

In support of its motion, Sony contends that "there is a liberal policy in favor of granting motions to stay proceedings pending the outcome of USPTO reexamination proceedings." ASCII

<u>Corp. v. STD Entm't USA, Inc.</u>, 844 F. Supp. 1378, 1381 (N.D.Cal. 1994)

Sony argues that a stay in this case is appropriate because: 1) St. Clair produces no products under the patents-in-suit, and therefore, money damages will be an adequate remedy for any delay a stay might cause; 2) a stay permitting reexamination has the potential to moot the entire action, or at least simplify it dramatically.

St. Clair responds that a stay is not warranted because: 1) Sony's request is made only to delay the case; 2) discovery is complete and the trial date weeks away and therefore, the delay that will result while the reexamination proceedings go forward will unduly prejudice St. Clair in the presentation of its case; 3) St. Clair argues a stay will not simplify the issues that the trial must resolve due to the "non-overlapping issues" between the reexamination and this litigation ; and 4) St. Clair contends that cancellation of the patent claims is unlikely.

Courts typically cite three factors that should guide the exercise of a court's discretion when deciding whether a stay is appropriate: 1) whether the granting of a stay would cause the non-moving party to suffer undue prejudice from any delay or allow the moving party to gain a clear tactical advantage over the non-moving party; 2) whether a stay will simplify the issues for trial; and 3) whether discovery is complete and a trial date

set.

Applying these factors in the context of the parties' arguments, I find that a delay in the commencement of the February 2003 trial will unduly prejudice St. Clair for the reasons it cites.  I also find, as St. Clair contends, that it is unlikely the pending reexamination proceedings will do much to simplify the issues that need to be tried in this case. And finally, the fact that the instant motion was filed after the close of discovery and weeks before the commencement of the scheduled trial date is persuasive.

In addition to the three traditional factors, I have also considered whether a stay would substantially contribute to or result in a final disposition of this case or substantially contribute to a more efficient and less costly trial.

In this regard, I find that a stay will do neither because: 1) This case, like many, is about "the injunction."  If successful at trial, St. Clair will aggressively seek an injunction against Sony.  Sony will aggressively oppose St. Clair's efforts.  In my view, the pending reexamination proceeding will not do much to contribute to this end game strategy.  2) The reexaminations requested by Sony, are more about the claim interpretation provided by me than any prior art contentions.  3) Lastly, I am persuaded that neither St. Clair nor Sony will be unduly prejudiced by proceeding to trial now, because I am convinced that a trial and appeal is what will

finally resolve the parties' dispute.

NOW THEREFORE, FOR THE REASONS DISCUSSED, IT IS HEREBY
ORDERED that Sony's Motion To Stay Pending The Outcome Of
Reexamination Proceedings (D.I. 202) is **DENIED** .

_January 30, 2003_
DATE

_Joseph J. Farnan Jr._
UNITED STATES DISTRICT JUDGE

# EXHIBIT D

STATEMENT OF

THE HONORABLE JON W. DUDAS

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY
AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE

SUBCOMMITTEE ON COURTS, THE INTERNET, AND INTELLECTUAL PROPERTY
Committee on the Judiciary

U.S. House of Representatives

"Committee Print Regarding Patent Quality Improvement"

APRIL 28TH, 2005

## Introduction

Chairman Smith, Ranking Member Berman, and Members of the Subcommittee:

Thank you very much for inviting me to testify today. I commend you for holding this hearing and last week's hearings on improving the patent system. This is a particularly appropriate time to reflect upon the incredible success of invention and of our patent system in the United States. It was 215 years ago this month that our young nation adopted its first patent statute. On April 5, 1790, your predecessors in Congress passed the final version of the statute, and President George Washington signed it into law on April 10.

## Strength of our Patent System

The benefits of our patent system have always been obvious to Americans. You are familiar with Article I, Section 8, Clause 8, of the U.S. Constitution, granting Congress the power "to promote the progress of science and the useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." James Madison wrote in one of the Federalist Papers, "The utility of this power will scarcely be questioned." He was right. That clause was adopted into the Constitution without a dissenting vote -- without even any recorded debate.

The need for a statutory system to examine and grant patents was just as obvious. President Washington signed the first patent statute 215 years ago -- before our Nation even had its 13th state.  History has repeatedly affirmed the wisdom of this decision of our Nation's founders.  The tremendous ingenuity of American inventors, coupled with an intellectual property system that encourages and rewards invention, has propelled our nation from a small agrarian society to the world's preeminent technological and economic superpower.

The flexibility and strength of our patent system have helped entire industries flourish, rather than perish.  Everyone has benefited from the innovative products encouraged by this system.  And all of the technology encouraged by the patent system finds its way to the public domain within 20 years -- freely available to any and all.

The success of the patent system is not limited to the United States.  It is the basis for economic development in nations throughout the world.  Unfortunately, a growing chorus of critics is asking if the fundamental patent system that has been so critical to the growth of innovation and economic success in the United States and other nations will enhance or hinder development in their nations.

Today, many of the nations questioning the efficacy of an intellectual property system have become hotbeds for the manufacture and export of counterfeit goods. Unsurprisingly, some of the nations that allow their citizens to counterfeit and pirate others' intellectual property are the very ones questioning a system that encourages and rewards invention, and discourages copying and free riding.

**The USPTO Today and Prominent Issues**

In the last several years, intellectual property (IP) assets have become an ever more essential ingredient of economic vitality.  In the past, raw materials and other tangible goods were the main drivers of an economy.  Today, economic success depends increasingly on intangible, information-based assets, such as the creativity of employees and the knowledge gained from research.  As a result, intellectual property-based industries, such as biotechnology and entertainment, now represent the largest single sector of the U.S. economy.  In fact, IP industries export more American value to the world than the automobile, automobile parts, agricultural, and aircraft industries combined.

As the clearinghouse for U.S. intellectual property rights, the USPTO is an important catalyst for U.S. economic growth.  Through the grant of patents and the registration of trademarks, the USPTO promotes the economic vitality of businesses and entrepreneurs, paving the way for investment capital, research and scientific development.

We are proud of our 200-year-old legacy of partnership with America, providing the tools for our nation to become a technological and economic giant.     **To continue this partnership, we must remain the best patent-examination system in the world.   To ensure ongoing success, the USPTO must focus on improved quality and productivity.  To ensure timely grant of rights, we must reduce our backlog of**

**patent applications by increasing our efficiency and taking advantage of our automation efforts.**

The improvement of the patent system for the 21st century has several components: Some require legislation, while others can be accomplished by the USPTO through rule making. Several initiatives in the committee print were also part of our Strategic Plan, including expanding the early publication of patent applications at 18 months and assignee filing. We appreciate these being included in your legislative draft.

### *General Patent Reform*

As part of the intense interest in patent reform, there is considerable discussion about "patent quality" and "patent litigation reform." A threshold question is, of course, "Is reform necessary?" While we have much of which to be proud about our system, we believe the answer is a qualified "Yes." For example, we believe the best form of litigation relief may be a robust **post-grant review** system, which permits a less expensive and more expeditious route of reviewing patents than through district court litigation. Because of the importance we place on post-grant review, I would like to elaborate on this particular reform area.

### *The Review of Issued Patents*

Currently, the USPTO has only a limited role in reconsidering patentability decisions after we have issued a patent. The USPTO does **post-grant reviews** of patent claims only under certain circumstances, including,

> (1) when a patentee files an application to reissue a patent to correct at least one error in the patent,
> (2) when an applicant and a patentee claim the same invention, and an interference is declared between the patentee and the applicant, and the applicant seeks judgment based on unpatentability of patent claims, and
> (3) when a patent owner or third-party requests the reexamination of a patent.

Congress has incrementally added to the range of proceedings under the USPTO's jurisdiction under which third parties can obtain an Office review of issued patents. It introduced *ex parte* reexamination in 1980, under which a third party can petition for reexamination of the patent.[1] In 1984, section 135 of the Patent Act was amended to allow issues of patentability, as well as priority, to be included in interference proceedings.[2] In 1999, Congress, as part of the landmark patent reform, the American Inventors Protection Act (AIPA), created *inter partes* reexamination, whereby a third party can participate in the reexamination proceeding and appeal to the USPTO's administrative Board of Patent Appeals and Interferences.[3] And the AIPA's *Inter Partes*

---

[1] Pub. L. No. 96-517, § 1, 94 Stat. 3016 (1980).
[2] Pub. L. No. 98-622, 98 Stat. 33831 (1984).
[3] Intellectual Property and Communications Omnibus Reform Act of 1999, S. 1948, Pub. L. No. 106-113 (1999).

3

reexamination practice was expanded in 2002 to afford third parties the right to appeal to the U.S. Court of Appeals for the Federal Circuit.[4]

Although, through these amendments, the USPTO's role in helping guarantee the efficacy of the patent system after patent issuance has grown, none of these procedures alone or collectively have proved sufficient to optimize the USPTO's post-grant capability. Although a patentability challenge can be raised on all grounds in interferences interference proceedings only lead to challenges of patents when a pending application raises a priority issue as to a recently issued patent  Further, a third party may file a protest in a reissue proceeding; however, that is rare, and the third party has very limited participation. Apart from interferences and a reissue protest, a third party may challenge the patentability of patent claims in the Office only based on certain prior art references, namely, patents or printed publications via reexamination  In addition, except in interferences, a third party cannot conduct discovery and develop evidence necessary to challenge patentability, nor can the third party challenge patent owner evidence by cross-examination.

Some potential challengers also regard *ex parte* reexamination as an insufficient mechanism because, after the proceeding has begun, the third party's participation is limited to one reply, which is available only if the patent owner files a pre-examination statement. As a result, *ex parte* reexamination has not been used by third parties to the degree anticipated. The *inter partes* reexamination procedure established in 1999 was intended to address this defect; however, limitations on that process have led to it being rarely used. In particular, patentees understandably insisted, and Congress legislated, that a challenger in an *inter partes* proceeding be bound by its result by way of estoppel, including in subsequent litigation. However, the lack of such procedural mechanisms as discovery and cross-examination that would be available in litigation appears to mean that challengers have been unwilling to invoke *inter partes* reexamination and risk its estoppel effect. In fiscal year 2003, for example, the USPTO received approximately 355,000 patent applications and issued approximately 160,000 patents. Over the past five years, we have received approximately 1,600,000 applications and issued approximately 900,000 patents.[5] Yet, the total requests for *inter partes* reexamination during the nearly five years for which the procedure has been available, is a mere 85.[6]

Last November, pursuant to the requirement under the AIPA, the USPTO issued a report concerning the "inequities" of the *inter partes* reexamination system. Our report called for some relatively minor changes, and the USPTO recommended three amendments to the Patent Act to improve *inter partes* reexamination, the first two of which require some legislative activity:

---

[4] *21st Century Department of Justice Appropriations Authorization Act,* Pub. L. No. 107-273, 116 Stat. 1758, 1899-1906 § 13202 (2002).

[5] U.S. PATENT AND TRADEMARK OFFICE PERFORMANCE AND ACCOUNTABILITY REPORT FISCAL YEAR 2003. http://www.uspto.gov/web/offices/com/annual/2003/index.html.

[6] These *inter partes* reexamination requests included 43 patents from mechanical technologies, 20 in electrical arts, and 22 in the chemical arts.

- Maintaining, but clarifying, the *inter partes* estoppel provisions.
- Permitting the requester additional opportunities to provide input on Office actions.
- Extending the requester's 30-day comment period by permitting the USPTO Director to set the period for response by rule.

### Post-Grant Review

It is important to consider that, if parties will be estopped at any level by the result of a post-grant proceeding in the Office, they will generally demand that the proceeding offer a full and fair opportunity to litigate.  Viewed in this light, *inter partes* reexamination cannot be a true alternative to district court litigation.  As part of our Strategic Plan, we proposed a legislative initiative – Post-Grant Review – to address patent quality, as well as the badly needed patent litigation reform that is being advocated in many quarters.  We believe our proposal promotes invention by ensuring that the patent system is fair to all. By "fairness," we mean it promotes a patent system where flaws in issued patents can be quickly and expertly revealed, without exposing a patent holder to frivolous or even mischievous review and uncertainty.

Post-grant review will give the public another vehicle for identifying possible problems in issued patents.  Post-Grant Review has great support among all groups, including the bar, technology companies, academicians, and others seeking patent reform.  However, I wish to highlight several of the key areas where the Administration's proposal differs from some of the association proposals and how the USPTO's proposal contains special safeguards against the harassment of independent inventors and small businesses:

*Timing for open challenge to any issued patent*.  The USPTO proposal would give the public one year from the day a patent issues to petition for review of that patent.   One year is the appropriate length.  It gives potential challengers time to learn of the existence of issued patents, study the claims, consult with legal counsel, and gather the necessary research to decide whether or not they want to challenge the patent.

Other proposals set the public challenge period at nine months—based on the European model.  The USPTO proposal would require a petitioner to submit a very rigorous initial showing, with all relevant evidence necessary to meet a substantial initial threshold. Only with such a requirement can the Office hope to resolve these cases in the expedited fashion that all those advocating post-grant review seek. We are concerned that nine months may be too short a time for a potential petitioner to prepare the initial showing that would be necessary for this proceeding to be truly expeditious.   Moreover, the current period under U.S. law in which a patent may become subject to an interference in the Office is one year. For both reasons, the USPTO would propose that the initial period in which any member of the public may seek review of a patent be one year.

*Timing for challenge to issued patents requiring standing*.  The USPTO has also proposed that after the first year a person who has been threatened on the basis of a patent be able to challenge that patent in post-grant review.

This aspect of the proposal expands post-grant review from being primarily a quality check on the Office to a means of addressing high litigation costs.  The principal objections to this aspect of the USPTO's proposal concern whether the caseload level would be too high.  Any such proposal should give the Office some flexibility in determining the showing that a petitioner would be required to make before it could establish standing to bring a post-grant review action after the initial period.  An effective post-grant regime that includes the possibility of challenge throughout the life of the patent would allow Congress to abandon, rather than seeking to fix, the intrinsically less effective *inter partes* reexamination process.

*Scope of the Proceeding*.  In order for post-grant review to truly be effective, it must be used.  The USPTO proposal is robust enough to give petitioners and patentees surety that patentability issues can be put to rest in one proceeding.  The USPTO proposal allows the Office to examine every aspect of patentability (e.g., novelty (§ 102), non-obviousness (§ 103), written description (§ 112, paragraph 1)), while leaving equitable considerations largely for the U.S. district courts.  Including all bases for patentability for review is an absolute necessity if this new proceeding is to truly reduce litigation costs and improve patent quality.

*Threshold Showing*.  The USPTO would require the challenger to present sufficient grounds to proceed before instituting post-grant review.  This is more than a substantial new question of patentability, the reexamination standard, in most cases requiring the challenger to present evidence that if unchallenged would establish unpatentability.  We anticipate under this standard the Board would dismiss many petitions without any input from the patent owner.  This is one safeguard against abusive or disingenuous filings designed to harass patent owners.

*Estoppel*.  Another mechanism to prevent abuse is to ensure that the Real Party disclosed faces consequences for failing to demonstrate unpatentability.  The USPTO proposal would make the results of the proceeding binding on the parties, both of whom would have right of appeal to the Federal Circuit Court of Appeals.  During the public challenge period, the petitioner should be bound by the Office's decision regarding unpatentability based on any grounds the petitioner raised.  After the public challenge period—when the stakes are known and litigation is a genuine alternative—the petitioner should be bound by the Office's decision based on any grounds the petitioner raised or could have raised.

We look forward to working closely with the Subcommittee as the Committee print moves forward, especially since the USPTO will be the Federal agency responsible for conducting these proceedings.

**The USPTO and Tomorrow**

The Committee print includes other proposals, from many sources, focusing on ways in which to improve the patent system.

As noted above, we believe that some type of post-grant review will improve the overall character of our patent regime.  It is also important to underscore that many of the specific reform proposals addressed by the Committee print are not new.  In fact, several of the proposals suggested reflect ideas that have been previously identified and considered by the USPTO.

At the USPTO, we have had experts working on patent-reform issues for decades.  We welcome the discussion of many of these initiatives as part of a legislative package that you may introduce later this year.

**Conclusion**

Let me reiterate to you, the Members of the Subcommittee, that we share your commitment to ensure that our practices and policies promote invention and dissemination of new technologies.  While we work to improve our system by internal reform of USPTO operations, we realize that additional measures within the domain of Congress can also make invaluable contributions.

The overwhelming evidence of the history of the U.S. patent system suggests that strong intellectual property protection supports, rather than impedes, innovation.  Indeed, for more than 200 years, our patent system has helped American industry flourish, creating countless jobs for our citizens.  Advanced technologies have been - and continue to be - nurtured and developed in our Nation to a degree that is unmatched in the rest of the world.  In many instances, the availability of patent protection has been integral to these advancements.

In this regard, the USPTO and the Administration look forward to continuing to work with you and the Members of the Subcommittee as you develop reform legislation to ensure that the U.S. patent system remains the world leader.

Thank you, Mr. Chairman.